THE LAMPHERE SCHOOLS v LAMPHERE FEDERATION OF
TEACHERS

Docket No. 58159. Argued January 4, 1977 (Calendar No. 2).—Decided
     May 2, 1977.

     The Lamphere Schools brought a complaint against the Lam-
     phere Federation of Teachers, Allen Coulter, the Michigan
     Federation of Teachers, and Arsch Derbabian for damages
     arising from a teacher's strike. The schools were closed by the
     strike following unsuccessful contract negotiations. The school
     district alleged that the teachers' organizations were liable in
     tort for breaching a duty not to call a strike, for interfering
     with the contracts between the school district and individual
     teachers, and for a civil conspiracy in planning and implement-
     ing the strike in violation of the public employment relations
     act. The Oakland Circuit Court, James S. Thorburn, J., granted
     summary judgment for defendants for failure to state a cause
     of action. The Court of Appeals, McGregor, P. J., and T. M.
     Burns and N. J. Kaufman, JJ., affirmed (Docket No. 23275).
     Plaintiff appeals. *Held:*

          1. The Legislature, in enacting the public employment rela-
     tions act, intended it to occupy the public labor relations field
     completely in this context. The public employment relations act
     provides for exclusive remedies against both teachers and their
     federations for participation in illegal strikes. The legislative
     intent is that, except for the historical equitable relief of
     injunction, the statutorily permitted discipline or discharge
     should be the unitary and exclusive remedies available to
     public employers in dealing with illegal strikes by public em-
     ployees in violation of the public employment relations act. To
     infer that the act only applies to public employers and em-

REFERENCES FOR POINTS IN HEADNOTES
[1] 73 Am Jur 2d, Statutes §§ 272–276.
[2–5, 7] 48 Am Jur 2d, Labor and Labor Relations §§ 246, 1194–1197,
     1361, 1367, 1368.
[2] Labor law: Right of public employees to strike or engage in work
     stoppage. 37 ALR3d 1147.
[6] 48 Am Jur 2d, Labor and Labor Relations §§ 1155, 1156.

ployees, but not to the public employees' bargaining units, is specious. The statute clearly anticipates the existence of public employee labor organizations and their participation in violations of the act.

2. The Employment Relations Commission has exclusive jurisdiction to determine charges of unfair labor practices. To permit the school district to pursue the civil tort actions alleged in its complaint would necessarily circumvent the authority of the commission to determine such charges, and would seriously erode the exclusive jurisdiction of the commission.

3. Withholding services through peaceful concerted action of public employees does not give rise to a common-law cause of action in tort for damages, although strikes by public employees are against public policy and are therefore subject to injunction. There is no precedent for such a common-law cause of action in Michigan. Plaintiff's suggestion that the remedies available to school districts in dealing with teacher strikes are ineffective against federations is unpersuasive. Public policy considerations interdict the creation of a new cause of action, which would unsettle an already precarious labor-management balance in public labor relations.

Justice Levin concurred in the holding summarized in paragraph 1, above.

Justice Coleman, joined by Justice Ryan, concurred in the holding that § 6 of the public employment relations act applies to the facts of this case.

Affirmed.

67 Mich App 331; 240 NW2d 792 (1976) affirmed.

OPINION OF THE COURT

1. STATUTES—CONSTRUCTION—LEGISLATIVE INTENT.

The Supreme Court in resolving an issue involving any statutory schema will first look to the specific language of the statute itself; the Court, furthermore, has the duty to ascertain and declare the intention of the Legislature, which is then controlling.

2. LABOR RELATIONS—PUBLIC EMPLOYMENT RELATIONS ACT—LEGISLATIVE INTENT.

The Legislature in enacting the public employment relations act intended to proscribe strikes by public employees and to prescribe the means of enforcement and penalties for such strikes (MCL 423.201 *et seq.;* MSA 17.455[1] *et seq.).*

3. Labor Relations—Public Employment Relations Act—Teachers
   —Strikes—Remedies.

   The public employment relations act provides for exclusive reme-
   dies as to both teachers and their federations for participation
   in illegal strikes (MCL 423.206; MSA 17.455[6]).

4. Labor Relations—Public Employment Relations Act—Strikes
   —Remedies—Legislative Intent.

   The statutorily permitted discipline or discharge in the public
   employment relations act were intended by the Legislature to
   be the unitary and exclusive remedies available to public
   employers in dealing with illegal strikes by public employees in
   violation of the public employment relations act (MCL 423.206;
   MSA 17.455[6]).

5. Labor Relations—Public Employment Relations Act—Stat-
   utes.

   The public employment relations act is the dominant and govern-
   ing law regulating public employee labor relations; to infer
   from case law or the act itself that it only applies to public
   employers and employees, but not to public employees' bargain-
   ing units, is specious (MCL 423.201 *et seq.;* MSA 17.455[1] *et
   seq.).*

6. Labor Relations—Public Employees—Strikes—Torts—Equity.

   Withholding services through peaceful concerted action of public
   employees does not give rise to a common-law cause of action in
   tort for damages, although strikes by public employees are
   against public policy and are therefore subject to injunction.

CONCURRING OPINION

COLEMAN and RYAN, JJ.

7. Labor Relations—Public Employment Relations Act—Teachers
   —Strikes—Remedies.

   *The section of the public employment relations act which pro-
   vides a procedure for the discipline of public employees who
   strike applies to a peaceful strike by a public teachers' federa-
   tion (MCL 423.206; MSA 17.455[6]).*

*Clark, Hardy, Lewis & Fine, P. C.* (by *Dennis R. Pollard)* for plaintiff.

*Fieger, Golden & Cousens* for defendants.

Amici Curiae:

Michigan Education Association, by *Foster, Swift & Collins, P. C.* (by *Lynwood E. Beekman).*

Michigan State AFL-CIO, by *Marston, Sachs, Nunn, Kates, Kadushin & O'Hare* (by *Theodore Sachs* and *Charles Looman).*

BLAIR MOODY, JR., J. The issue in the case at bar is limited to whether a federation (union) of public school teachers may be held liable in tort by a public school district for alleged monetary damages incurred as a result of a peaceful strike prohibited by the public employment relations act (PERA), MCLA 423.201 *et seq.;* MSA 17.455(1) *et seq.*

We hold that plaintiff-appellant school district is barred from suing defendant-appellee federations for damages under any of the traditional common-law tort theories asserted *infra.* We arrive at this conclusion for basically three reasons.

First and foremost, after a careful study of both the specific language and the history of the PERA, we are convinced that the Legislature intended the PERA to occupy the public labor relations field completely in this context. Accordingly, except for the historical equitable relief of injunction, the remedies of discipline-discharge provided for under § 6 of the PERA are intended to be the sole and exclusive remedies available to a school district in dealing with a peaceful strike by a teachers' federation.

Secondly, upon careful examination of existing Michigan case law, we find no applicable precedent for the cause of action pled by plaintiff school district. Michigan common law provides no founda-

tion for the remedy sought under these circumstances.

Finally, we are convinced that public policy considerations interdict the creation of a new cause of action, which would unsettle an already precarious labor-management balance in the public labor relations sector.

Accordingly, we affirm both the circuit court and the Court of Appeals.

## I—FACTS

There is no material dispute as to the facts in the instant case. This is an appeal by plaintiff-appellant Lamphere Schools (hereinafter "school district") from a trial court order granting the defendants-appellees' motion for summary judgment and dismissing the school district's complaint for failure to state a cause of action.

Plaintiff school district reinstituted suit on December 4, 1974, against the following defendants-appellees: the Lamphere Federation of Teachers as the collective bargaining representative of the teachers employed by the school district; Allan Coulter as President of the Lamphere Federation; the Michigan Federation of Teachers; and Arsch Derbabian as agent and representative of the Michigan Federation (hereinafter "federations"). The school district sought to recover in tort both compensatory and punitive damages for two strikes conducted by the teachers in September and October of 1973. The predecessor to this case was initiated on September 10, 1973, dismissed without prejudice for reasons not pertinent here, and then refiled.

In January, 1975, the defendant federations filed a motion for summary judgment pursuant to GCR

1963, 117.2(1), alleging that the school district's complaint failed to state a cause of action. The motion was granted by the Oakland Circuit Court on February 5, 1975, and an order of dismissal was entered accordingly on February 14, 1975. The Court of Appeals affirmed the trial court's decision on February 10, 1976. 67 Mich App 331; 240 NW2d 792 (1976). This Court granted leave to appeal on May 27, 1976.

Briefly stated, the plaintiff school district and defendant federations were parties to a collective bargaining agreement covering the approximately 270 teachers employed by the school district. Prior to the expiration of that agreement on September 3, 1973, the parties commenced negotiations for a successor agreement. However, they had not reached agreement by September 3, 1973. The teachers, thereafter, went out on strike and stayed out from September 4, 1973, through September 24, 1973. No classes were conducted during the strike.

The teachers returned to their teaching duties on September 25, 1973, pursuant to an injunction obtained in a separate action filed by a student's parent in the Oakland Circuit Court. The teachers briefly renewed their strike on October 15, 1973, but returned to work the next day, following an order issued by the court to show cause why the teachers should not be held in contempt.

The terms for a successor collective bargaining agreement were ultimately reached and the agreement was signed in February of 1974. The injunction was dissolved. However, this tort suit was independent of the injunctive action and was expressly left standing by the successor agreement.

The school district alleged in its complaint that the conduct of the aforementioned federations

caused substantial damages to the school district. Count I of the complaint asserted that the federations, by their conduct, caused their member-teachers to strike contrary to an alleged common-law duty. Count II alleged that the conduct of the federations in recommending and subsequently calling the strike constituted a tortious interference with existing individual contractual relationships between the school district and its teachers. Count III of the complaint asserted a claim of recovery for civil conspiracy against the federations for planning and implementing the strike in violation of the PERA.

## II—THE PERA: LANGUAGE, INTENT, HISTORY

It is axiomatic that in resolving an issue involving any statutory schema, this Court will first look to the specific language of the statute itself. *Dussia v Monroe County Employees Retirement System,* 386 Mich 244; 191 NW2d 307 (1971). Furthermore, in interpreting a statute, this Court has the duty to ascertain and declare the intention of the Legislature; that intention, once ascertained, is then controlling. *Aikens v Department of Conservation,* 387 Mich 495; 198 NW2d 304 (1972).

In determining whether a public school district can maintain a civil tort action against the federations representing its teachers, where the federations allegedly precipitated a strike in violation of the statutory prohibition, this Court must examine the specific language and history of the PERA.

The purpose of the PERA, 1947 PA 336, as amended by 1965 PA 379, is well stated in the title of the statute:

"AN ACT to prohibit strikes by certain public em-

ployees; to provide review from disciplinary action with
respect thereto; to provide for the mediation of griev-
ances and the holding of elections; to declare and
protect the rights and privileges of public employees;
and to *prescribe means of enforcement and penalties
for the violation of the provisions of this act.* "[1] (Empha-
sis added, footnote omitted.)

Thus, it requires little extrapolation to ascertain
the Legislature's intent in enacting the PERA. The
Legislature intended to proscribe strikes[2] by public
employees and to prescribe the means of enforce-
ment and penalties for such strikes.

The plaintiff school district does not deny that
the Legislature intended to prescribe the remedies
for illegal strikes by public employees such as
teachers. Rather, in a bifurcated argument, the
school district maintains that remedies provided
for by the PERA were not intended to be the
*exclusive* remedies for illegal teachers' strikes
when precipitated by teachers' federations. Fur-
thermore, the school district claims that the PERA
remedies in fact provide school districts with no
remedies whatsoever against teachers' federations
which foment teachers' strikes. Therefore, plaintiff
asserts that school districts should be allowed to
maintain the aforementioned common-law tort ac-
tions against teachers' federations which precipi-
tate such strikes.

However, when we review the extensive enforce-

---

[1] "Whenever the body of an act contains a provision which is
considered ambiguous, there is much justification when a construction
is called for, in giving consideration to the title which the act bears."
*Kalee v Dewey Products Co,* 296 Mich 540, 545; 296 NW 826 (1941).

[2] "No person holding a position by appointment or employment in
the government of the state of Michigan or in the government of any
1 or more of the political subdivisions thereof, or in the public school
service, or in any public or special district, or in the service of any
authority, commission, or board, or in any other branch of the public
service, hereinafter called a 'public employee,' shall strike." MCLA
423.202; MSA 17.455(2).

ment procedures regarding illegal teachers' strikes as outlined in § 6 of the PERA, we find that the act's careful wording does indeed provide for exclusive, after-the-fact statutory remedies as to both teachers *and* their federations for participation in such strikes:

"*Notwithstanding the provisions of any other law, any person holding such a position who, by concerted action with others,* and without the lawful approval of his superior, wilfully absents himself from his position, or abstains in whole or in part from the full, faithful and proper performance of his duties for the purpose of inducing, influencing or coercing a change in the conditions or compensation, or the rights, privileges or obligations of employment shall be deemed to be on strike but the person, upon request, shall be entitled to a determination as to whether he did violate the provisions of this act. The request shall be filed in writing, with the officer or body having power to remove or discipline such employee, within 10 days after regular compensation of such employee has ceased or other discipline has been imposed. In the event of such request, the officer or body shall within 10 days commence a proceeding for the determination of whether the provisions of this act have been violated by the public employee, in accordance with the law and regulations appropriate to a proceeding to remove the public employee. The proceedings shall be undertaken without unnecessary delay. The decision of the proceeding shall be made within 10 days. *If the employee involved is held to have violated this law and his employment terminated or other discipline imposed,* he shall have the right of review to the circuit court having jurisdiction of the parties, within 30 days from such decision, for determination whether such decision is supported by competent, material and substantial evidence on the whole record." (Emphasis added.)

This Court discussed the exclusivity of § 6 sanctions in *Rockwell v Crestwood School District*

*Board of Education,* 393 Mich 616; 227 NW2d 736 (1975). The issue in that case was whether school teachers who strike may be discharged without a prior hearing. The case turned upon the resolution of an alleged conflict between the PERA and the teachers' tenure act. MCLA 38.101; MSA 15.2001.

Regarding the § 6 sanctions of the PERA, the majority opinion in *Rockwell,* in developing its conclusion, reasoned:

"Section 6 begins with the words '[n]otwithstanding the provisions of any other law'.

"The Legislature, recognizing the diversity of legislation concerning public employees, provided in § 6 a specific, *unitary* procedure for the discipline of public employees who strike superseding the diverse procedures applicable to different public employees where the basis for discipline is a ground other than striking." *Rockwell, supra,* 628. (Emphasis added.)

Significantly, the dissenting opinion, although suggesting the PERA merely staked out a new statutory collective bargaining system coexisting with the old statutory system, noted:

"We also take note that the opinion of Justice LEVIN expresses a commendable concern that there be in Michigan under aegis of PERA/MERC, similar to the Federal pattern of NLRA/NLRB, a unitary procedure for the discipline of public employees who strike. This is a concern, as Justice LEVIN's opinion points out, that this Court as a whole shares, and this specific opinion agrees with." *Rockwell, supra,* 658.

It becomes evident that the full Court recognized that a unitary procedure for the discipline of public employees who strike would be salutary and was intended by legislative enactment. Although a difference of interpretation existed in that case

regarding the priority of two conflicting statutes, the underlying intention of the Legislature to create exclusive remedies by statute is made apparent.

Equitable relief, of course, always remains available via injunction. See the PERA § 16(h) and *Holland School District v Holland Education Association,* 380 Mich 314; 157 NW2d 206 (1968). But the foregoing emphasized language of § 6 of the PERA reflects legislative intent that the statutorily permitted discipline-discharge should be the unitary and exclusive remedies available to public employers in dealing with illegal strikes by public employees in violation of the PERA's § 2 strike prohibition.[3]

Plaintiff school district, however, suggests that the § 6 remedies of the PERA were only intended to apply to the striking employees, not to their collective bargaining units through which they effectuate such strikes. The school district urges that we adopt a dualistic approach in interpreting the PERA's § 6 remedies and, accordingly, dichotomize the federation and its teachers. In other words, plaintiff school district requests that this Court construe the PERA and its § 6 remedies as applying only to the public employees but not their collective bargaining organizations. This is clearly a distinction without substance and one which could only lead to absurd results.[4]

---

[3] The phrase "[n]otwithstanding the provisions of any other law" could be broadly construed to include both statutory and case law, Black's Law Dictionary (4th ed), pp 1028–1029. Such construction need not be entertained here. There was no precedent for the proposed action under the common law at the time the PERA was enacted *(see* part IV). Nor may such cause be implied from the PERA. Furthermore, the statutory remedy contained in § 6 is adequate *(see* part V).

[4] Any construction of a statute leading to an absurd consequence should be avoided. *In re Petition of Michigan State Highway Commission,* 383 Mich 709; 178 NW2d 923 (1970). It is not difficult to

This Court, in *Rockwell,* declared the PERA to be the "dominant" and "governing" law regulating "public employee labor relations":

"This Court has consistently construed the PERA as the *dominant* law regulating *public employee labor relations.*

\* \* \*

"The supremacy of the provisions of the PERA is predicated on the Constitution (Const 1963, art 4, § 48) and the apparent legislative intent that the PERA be the *governing* law for *public employee labor relations.*" 393 Mich 616, 629–630 (Emphasis added.)

To somehow infer from *Rockwell* or the PERA itself, that the PERA only applies to public employers and public employees, but not to the public employees' bargaining units, is specious. The PERA clearly anticipates the existence of public employee labor organizations. The § 6 phrase, "concerted action with others" clearly implies the existence of and participation by unions. The word "concerted" is a term of art which has been consistently construed as referring to unionization. *National Labor Relations Board v Erie Resistor Corp,* 373 US 221; 83 S Ct 1139; 10 L Ed 2d 308 (1963).

Furthermore, the participation by public employees' unions is either impliedly or explicitly acknowledged throughout the various sections of the PERA. See, for example, "concerted failure to report for duty" in § 1; "collective bargaining" in §§ 7, 11, 12, 13, 14 and 15; "labor organization(s)" in §§ 9, 10 and 12. Hence, we reject the notion that

anticipate a proliferation of litigation if we adopted plaintiff's interpretation. As in the instant case, counter-complaints by defendants would become standard. Various public employers and public employees, as well as unions, would take turns suing each other for tortious damages *ad nauseam.*

the PERA, and specifically the § 6 remedies, only apply to and affect public employees individually, but not their collective bargaining units. The PERA was intended to occupy the public employee labor relations field completely; no viable distinction exists between the constituent public employees and their unions in this context.[5] Therefore, along with the equitable relief of injunction, the § 6 remedies of the PERA are presently the exclusive remedies available to plaintiff school district in the case at bar when confronted by an illegal, though peaceful, strike by the teachers, even if such strike was precipitated by defendant federations.

While we are convinced that both the specific language of the PERA and the underlying legislative intent of the PERA are sufficient to support our conclusion regarding the exclusivity of § 6 remedies, we believe the legislative history of the PERA serves to buttress our holding.

The PERA drastically altered public employee labor relations in Michigan by amending the Hutchinson Act, 1947 PA 336. The Hutchinson Act had prohibited public employees from engaging in collective bargaining. The PERA not only permitted collective bargaining by employees, see § 9, but it required public employers to negotiate with public employees' bargaining units, see § 10.

Public employees, however, were still prohibited from striking, see § 2. Significantly, the Legislature deleted the only section, § 8, of the Hutchinson Act which permitted remedies against third parties, such as unions.

Former § 8 provided as follows:

---

[5] Part III of this opinion discusses how the Legislature could have provided for specific remedies against unions as organizations, if it had so desired.

"Any person not a public employee who shall know-
ingly incite, agitate, influence, coerce, or urge a public
employee to strike shall be deemed to be guilty of a
misdemeanor, and upon conviction shall be punished by
imprisonment for not to exceed 1 year, or by a fine of
not less than $100.00 nor more than $1,000.00, or both
such fine and imprisonment in the discretion of the
court."

Even assuming *arguendo* that this section may
have allowed for a civilly-enforceable duty under
any of the three tort theories alleged by the school
district *supra,* the Legislature's flat-out elimina-
tion of § 8 bespeaks a conscious legislative intent
to nullify even the remotest possibility of such
actions, criminal or civil.

Hence, it once more becomes evident that our
Legislature was not only concerned with specifying
labor-management obligations in the PERA, but
was pre-eminently concerned with providing the
exclusive sanctions for any violations of those
obligations.

### III—MERC: EXCLUSIVE JURISDICTION

The Legislature saw fit to vest the authority for
determining unfair labor practices under the
PERA, see § 10, in the Michigan Employment
Relations Commission (MERC). See PERA, § 16.

In *Rockwell, supra,* 637, this Court determined
that striking teachers discharged pursuant to the
§ 6 remedies of the PERA may be entitled to
reinstatement by MERC if it can be shown that
their strike was precipitated by an employer's
unfair labor practice. This Court reasoned that
despite the illegality of the teachers' strike, the
employer's conduct may convert the economic
strike into an unfair labor practice strike and thus
permit reinstatement:

"Although a strike begins as an economic strike, if it is determined that the employer engaged in an unfair labor practice, the strike may be held to be an unfair labor practice strike and the striking employees entitled to reinstatement."

Accordingly, under the *Rockwell* rationale, striking teachers may possess a potential defense to their discharge by a school district: namely, that they (the teachers) engaged in an illegal work stoppage because certain conduct by the employer school district constituted an unfair labor practice. See *Mastro Plastics Corp v National Labor Relations Board,* 350 US 270; 76 S Ct 349; 100 L Ed 309 (1956). The final determination regarding any alleged unfair labor practice and any subsequent reinstatement would be left to MERC, subject to judicial review.

The jurisdiction and authority of MERC to determine unfair labor practices were held by this Court to be *exclusive.* In *Rockwell, supra,* 630, this Court unequivocally stated:

"MERC *alone* has jurisdiction and administrative expertise to entertain and reconcile competing allegations of unfair labor practices and misconduct under the PERA." (Emphasis added.)

The exclusive jurisdiction of MERC to determine unfair labor practice charges also has been acknowledged by this Court in *Labor Mediation Board v Jackson County Road Commissioners,* 365 Mich 645; 114 NW2d 183 (1962).

If this Court permitted plaintiff school district to pursue any of the three civil tort actions pled (causing teachers to breach a duty, tortious interference with existing individual contractual relationships, civil conspiracy), such a result would

necessarily circumvent the authority of MERC to determine charges of unfair labor practices. This becomes apparent since the defendant federations, as representatives of the teachers, would inevitably defend proposed civil actions by alleging unfair labor practices. Then the determination of whether or not an unfair labor practice occurred would inexorably fall to the forum in which the tort action was brought—the circuit court.

Ignoring for the moment the other policy ramifications of reinvolving the circuit courts in the public labor relations sector (see part V), the jurisdiction of MERC would be seriously eroded. The circuit courts would be forced to make the same unfair labor practice determinations as to the federations heretofore exclusively reserved to MERC. The unpleasant specter of the courts and MERC sharing this authority, combined with the very real possibility of conflicting decisions, could only further confuse labor relations in the public sector. The Court of Appeals ably pointed this out in its well-reasoned opinion in this case:

"However, even if a civil damage action were allowed under these conditions, it would nevertheless cause an irreconcilable conflict with other provisions of the PERA. The PERA gives to MERC and not to the courts the primary responsibility to balance the competing equities when unfair labor practices or other misconduct have been committed by both sides. See *Rockwell, supra,* 639. Thus, if we permitted the courts to become directly involved in this determination we would be seriously undercutting the statutory responsibility given to the MERC." 67 Mich App 337.

It should be noted that both parties in the case at bar analogize to Federal pre-emption concepts in arguing whether or not MERC and the PERA were intended to "pre-empt" the public labor rela-

tions sector, so as to exclude any civil tort actions. While Federal-state conflicts are concededly not at issue in this state case, precedents under the National Labor Relations Act (NLRA), from which the PERA is derived, are to be persuasively considered. *Detroit Police Officers Association v Detroit*, 391 Mich 44; 214 NW2d 803 (1974), *Michigan Employment Relations Commission v Reeths-Puffer School District*, 391 Mich 253; 215 NW2d 672 (1974).

The linchpin for plaintiff school district's contention that the prescribed legislative remedies of the PERA are not exclusive is *United Construction Workers v Laburnum Construction Corp*, 347 US 656; 74 S Ct 833; 98 L Ed 1025 (1954). *Laburnum,* according to the school district, stands for the proposition that an employer may maintain an action for civil damages against a labor organization without circumventing the authority of the National Labor Relations Board (NLRB) to determine unfair labor practice charges. However, this Court finds the school district's reliance on *Laburnum* to be misplaced.

In *Laburnum,* defendant labor organization threatened the plaintiff corporation and its employees with violence after the corporation's employees had refused to join the union. The union's threats of violence were so extreme that the corporation was compelled to cease operations. The corporation sued the union in state court for damages and prevailed. The union contended, in its defense, that the state court was precluded from entertaining common-law tort actions for the recovery of damages caused by union misconduct. The union argued that its conduct constituted an unfair labor practice condemned by the Labor Management Relations Act (LMRA), 29 USC 141 *et seq.*

The United States Supreme Court phrased the issue thus:

"The question before us is whether the Labor Management Relations Act, 1947, has given the National Labor Relations Board such exclusive jurisdiction over the subject matter of a common-law tort action for damages as to preclude an appropriate state court from hearing and determining its issues where such conduct constitutes an unfair labor practice under that Act. For the reasons hereafter stated, we hold that it has not." 347 US 656, 657.

The Supreme Court decided that the common-law tort action could be maintained by plaintiff corporation in state court without circumventing the authority vested in the NLRB by the LMRA to determine unfair labor practice charges. However, that Court's decision was very narrowly drawn, recognizing only that a state could utilize its inherent police power to control *violent* tortious conduct which threatened the public safety or welfare.

Since *Laburnum* was handed down, it has been consistently construed to provide an exception to pre-emption concepts only when union violence occurs. The Supreme Court made this very clear in *San Diego Building Trades Council v Garmon,* 359 US 236, 247–248; 79 S Ct 773; 3 L Ed 2d 775 (1959):

"It is true that we have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order, *United Automobile Workers v Russell,* 356 US 634 [78 S Ct 932; 2 L Ed 2d 1030 (1958)]; *United Construction Workers v Laburnum Construction Corp,* 347 US 656 [74 S Ct 833; 98 L Ed 1025 (1954)]. We have also allowed the States to enjoin such conduct. *Youngdahl v Rainfair, Inc,* 355 US 131 [78 S Ct 206; 2 L Ed 2d 151 (1957)]; *United*

*Automobile Workers v Wisconsin Employment Relations Board,* 351 US 266 [76 S Ct 794; 100 L Ed 1162 (1956)]. State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction. We recognize that the opinion in *United Construction Workers v Laburnum Corp,* 347 US 656 [1954], found support in the fact that the state remedy had no federal counterpart. But that *decision was determined, as is demonstrated by the question to which review was restricted by the 'type of conduct' involved, i.e., 'intimidation and threats of violence.' In the present case there is no such compelling state interest."* (Emphasis supplied).

*Laburnum* and *Garmon* were similarly read together in Morris, The Developing Labor Law (1971), p 792:

"Since the basis of the award of damages in *Garmon* was uncertain, it was remanded to the California Supreme Court. Although violent conduct was not involved, the employers argued that the award should be sustained on the basis of *United Construction Workers v Laburnum Construction Corp.* Violent conduct such as that in *Laburnum* had formed the basis of an exception to the application of the preemption doctrine. When the California Supreme Court sustained the award of damages on the basis of California law, the Supreme Court granted certiorari to consider a second issue: whether the state court had jurisdiction over tortious, but peaceful, labor activity. The award of damages was reversed on grounds which narrowed the *Laburnum* holding to the type of conduct involved therein. The Court stressed that its primary concern was not the nature of the relief but rather the broad scope of the activities regulated by federal law and protected from state actions by the preemption doctrine."

The conduct of defendant federations and their

"member" teachers in the instant action was clearly *non-violent.* At most, the teachers peacefully picketed the school district's facilities. There were no allegations of violence. Absent the crucial element of *violence, Laburnum* is inapplicable.[6]

Therefore, the analogical references to Federal pre-emption concepts tend to cut in just the opposite direction from that which plaintiff school district urges. We are more convinced that the school district's cause of action flies in the face of the exclusive § 6 remedies intended by the PERA and the authority of MERC to resolve unfair labor practice charges.

Surely, if the Legislature had intended to supplement the discipline-discharge remedies of § 6 with the inherently different remedy of money damages against a union representing public employees involved in a peaceful strike, it could have done so. The Legislature could have adopted language similar to that of Congress in enacting § 303 of the Taft-Hartley Act, 29 USC 187, to allow damage actions against unions engaging in secondary boycotts. Or, the Legislature could have enacted a remedy similar to § 301 of the Taft-Hartley Act, 29 USC 185, which permitted Federal court damage actions for breaches of labor contracts.

However, the Legislature did not see fit to so act. Therefore, this Court, like the United States Supreme Court, believes that in reviewing remedies relative to the PERA, we must insist that only remedies authorized by the Legislature be permitted in the context of a public employees' union-employer labor dispute such as we have in the

---

[6] Since no violence occurred in the case at bar, we find that *Laburnum* does not apply. However, we limit our finding to just that point. We are *not* deciding whether allegations of violence would make *Laburnum* applicable in Michigan. For a further discussion of this issue, *see* Justice Douglas' dissent in *Laburnum, supra,* 669–671.

case at bar. *H K Porter Co, Inc v National Labor Relations Board,* 397 US 99; 90 S Ct 821; 25 L Ed 2d 146 (1970). Even parallel damage remedies are precluded where the legislative purpose is to centralize remedial powers in a prescribed manner:

"Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme. See *Garner v Teamsters Union,* 346 US 485, 492–497 [74 S Ct 161; 98 L Ed 228 (1953)]. It may be that an award of damages in a particular situation will not, in fact, conflict with the active assertion of federal authority. The same may be true of the incidence of a particular state injunction. To sanction either involves a conflict with federal policy in that it involves allowing two lawmaking sources to govern. In fact, since remedies form an ingredient of any integrated scheme of regulation, to allow the State to grant a remedy here which has been withheld from the National Labor Relations Board only accentuates the danger of conflict." *Garmon, supra,* 247.

### IV—Michigan Common Law: No Precedent

The proposed remedies in tort which the school district asserts, in the case at bar, are heretofore unknown to the Michigan common law. Although couching its cause in such familiar tort terms as "causing a breach of a common law and statutory duty", "intentional interference with individual contractual relationships"[7] and "civil conspiracy",

---

[7] Defendant federations claim, that even if the instant tort actions asserted by plaintiff school district were known to the Michigan common law in this context, the school district could not maintain an action for intentional interference with individual contractual relationships.

Defendant federations submit that the teachers and the school district are parties to two contracts. The first contract is the master collective bargaining contract which the teachers negotiate, through their federations, with the school district. This master contract determines the general terms and conditions of employment. The second

the school district attempts to recover monetary damages from teacher federations for conduct not presently actionable, to wit: the withholding of services through peaceful concerted action of public employees.

Plaintiff school district fails to cite to this Court any prior case in this jurisdiction which has considered the instant question under any tort theory. Moreover, in other states which have statutes prohibiting public employee strikes, the principle permitting a cause of action in tort for damages has not been *judicially* adopted.[8]

---

contract is the individual teacher tenure contract which each teacher signs separately with the school district. This contract is a continuing tenure contract pursuant to the School Code of 1955, MCLA 340.569; MSA 15.3569 (now the School Code of 1976, MCLA 380.1231; MSA 15.41231, eff January 1, 1977), and the teachers' tenure act, MCLA 38.91; MSA 15.1991.

Therefore, the defendant federations urge that when the master contract expired in the instant case, the individual tenure contracts simultaneously expired, due to their derivative nature. Accordingly, it was impossible for the federations to interfere with contracts which lacked any validity. Defendant federations rely primarily upon *Detroit Federation of Teachers v Detroit Board of Education,* 396 Mich 220; 240 NW2d 225 (1976), as authority for their position.

Plaintiff school district retorts that the continuing individual teacher tenure contracts are by their terms expressly "continuing" and, therefore, separate contracts from the master collective bargaining contract. Hence, these individual contracts by their very terms expressly survive the expiration of the master contract. *See* the School Code of 1955 and the teachers' tenure act, *supra,* for language to such effect.

This Court need not decide this issue at this time. In *Rockwell, supra,* 630, we made it quite clear that "[t]he teachers' tenure act was not intended, either in contemplation or design, to cover labor disputes between school boards and their employees". The PERA, and the PERA alone, was intended to occupy the public labor relations sector completely and exclusively in peaceful strike situations. *Cf.* parts II and III of this opinion.

It would, therefore, be inconsistent on our part to allow the respective parties in the instant action to maintain or defend alleged tort lawsuits, arising out of disputes in the public labor relations field, on the basis of tenure contracts authorized by either the teachers' tenure act or the School Code of 1955.

[8] *See, generally,* Anno: *Labor Law; Right of Public Employees to Strike or Engage in Work Stoppage,* 37 ALR3d 1147.

*See specifically,* for example, 43 Pa Stat Ann 1101.1003 (Purdon,

Plaintiff requests this Court to create such a new cause of action. It contends, *inter alia,* that its suit for civil damages is not primarily an action to enforce the § 2 no-strike provision of the PERA but rather is based upon a "long-standing" common-law policy in Michigan disfavoring strikes by public employees.

The school district submits that the § 2 no-strike provision of the PERA represents merely an ancillary codification of the common-law prohibition of strikes by public employees. It suggests the § 6 discipline-discharge remedies of the PERA are, therefore, cumulative and not exclusive, relying upon *Pompey v General Motors Corp,* 385 Mich. 537, 552; 189 NW2d 243 (1971). In the *Pompey* case[9] this Court stated:

"The general rule, in which Michigan is aligned with a strong majority of jurisdictions, is that where a new right is created or a new duty is imposed by statute, the remedy provided for enforcement of that right by the statute for its violation and nonperformance is exclusive. *Thurston v Prentiss* 1 Mich 193 (1849); *In re Quinney's Estate,* 287 Mich 329 [283 NW 599] (1939); *Lafayette Transfer & Storage Co v Michigan Public*

Cum Supp, 1976–1977) and *Armstrong School District v Armstrong Education Association,* 5 Pa Commw Ct 387; 291 A2d 125 (1972). Under statute governing public employee labor relations, the court is empowered to grant equitable relief only to end a public employees' strike; for a court to have any further equity jurisdiction in such labor dispute, there must be a further statutory grant.

*See also,* 41 Ohio Rev Code Ann 4117.01 *et seq.* (Page), and *Goldberg v Cincinnati,* 26 Ohio St 2d 228; 55 Ohio Op 2d 468; 271 NE2d 284 (1971). Strikes by public employees are prohibited at common law and may be enjoined.

Without statutory sanction, there is a dearth of support for the principle urged by plaintiff.

[9] We note in passing that, while for purposes of discussion here, we accept *Pompey* for the general proposition cited, that case is easily distinguished from the case at bar. *Pompey* dealt with the exclusive-cumulative dichotomy regarding statutory remedies in the context of fundamental or *civil* rights. The instant case involves damages arising out of the alleged violation of *proprietary* rights. *Pompey, supra,* 553.

*Utilities Commission,* 287 Mich 488 [283 NW 659] (1939). Correlatively, a statutory remedy for enforcement of a common-law right is deemed only cumulative."

This Court, however, finds that the PERA remedies are exclusive, not cumulative, in the case at bar for the following reasons.

Prior to the enactment of the PERA in 1965, Michigan public employees enjoyed relatively few of the organizational privileges which their counterparts in the private sector enjoyed. The right of collective bargaining by public employees was in comparative infancy; strikes were virtually unknown.

In 1952, this Court was required to decide whether certain public transportation employees had the right to strike. In *Detroit v Division 26 of the Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America,* 332 Mich 237, 248–249; 51 NW2d 228 (1952), it was recognized that the common law prohibited such strikes. However, the Court specifically limited the remedy to injunction:

" 'The question is whether or not public employees do have the right to strike. Under the common law,—and there is no question about it so far as this court is concerned,—there is no right to strike on behalf of public employees, for many reasons, some of which at least might be paraphrased in the language of several of the decisions, that it is a means of coercing the delegation of the discretion which a public board or public body must exercise in its fulfillment of its duties. (Citing several cases.) * * *

" 'It has been repeatedly stated that it is against public policy for public employees to strike. Many courts have held that a strike by public employees is against public policy, is unlawful, illegal and may be

restrained and enjoined.' *Cleveland v Division 268,* 41
Ohio Op 236; 90 NE2d 711 [Common Pleas, Cuyahoga
County, 1949]."

Plaintiff school district correctly relies on the
*Detroit* case for the proposition that strikes by
public employees are unlawful at common law.
However, that case falls far short of creating the
classic "duty", "breach of duty", therefore, "mone-
tary damages" triad of traditional tort law. The
*Detroit* case stands for the limited proposition that
strikes by public employees are against public
policy *and are therefore subject to injunction.*
There is no precedent establishing a common-law
tort duty owed by the federation or its teachers to
the school board regarding peaceful strike activi-
ties.[10]

Strikes by public school teachers are against
public policy because they deprive the *public* of
necessary educational services. The sole remedy
apart from the statute in Michigan is injunction
because our courts recognize that this remedy
presents the best possible means for assuring the
uninterrupted delivery of vital educational ser-
vices to the *public.* This historical authority, care-
fully applied by courts, to enjoin public employee
strikes has been clearly reaffirmed in *Holland
School District v Holland Education Association,
supra.*

In no manner does the *Detroit* case or any
known Michigan case even suggest that monetary
damages can be obtained by a school district from
the teachers or the teachers' federation under any

---

[10] Also, it is noted *Holland School District v Holland Education
Assn, supra,* held that although the distinctions between law and
equity *proceedings* were abolished by constitutional provisions, the
historic difference between law and equity was not abolished. *Holland*
involved an equitable proceeding and held only that equitable injunc-
tive relief could be granted, aside from the subject statutory remedy.

theory, in the event of a peaceful strike. There has been no case which would support the contention that there is a common-law tort of "public teacher strikes" with an attendant remedy. On the contrary, there is a total absence of any such preexistent common-law remedy.

Accordingly, the statutory remedy provided for by the Legislature in the PERA cannot be "cumulative" to a remedy which is nonexistent. As the common law affords no basis for the school district's liability and remedy theories, plaintiff is thus limited to the statutory remedy, provided that remedy is adequate. See *Pompey v General Motors, supra,* 552.

## V—PUBLIC POLICY

This Court is convinced that plaintiff school district's alleged cause of action against defendant federations is untenable under either legislative intent standards or common-law arguments. Additionally, in order to fully explicate this issue, we address the public policy considerations raised by both parties.

Plaintiff school district urges that even if this Court rejects its position regarding the exclusivity of the PERA and MERC remedies (parts II and III), or its common-law argument (part IV), we should nevertheless *create* by judicial fiat the cause of action pled because the remedies provided for in the PERA are "inadequate". Utilizing *Pompey v General Motors, supra,* 553, as precedent, the school district argues that the PERA § 6 remedies of discharge-discipline or the injunctive remedy provide "no remedy whatsoever" against the federations and their agents who allegedly precipitated the strike by the teachers.

First, we cannot agree with plaintiff school district's characterization of the effectiveness of the present remedies available to school districts in dealing with teacher strikes. One need only look to *Rockwell, supra,* and its aftermath to understand how unpersuasive we find this suggestion. It is a matter of public knowledge that the subsequent decrease in strikes by public school teachers has been dramatic.

Nor can we accept the school district's thrust that while the discipline-discharge remedies may be effective against the individual teachers, they provide no remedy against the defendant federations and their agents. This reasoning again overlooks the plain fact that the teachers-members are the federation, collectively speaking. The function of these public employees' federations is the representation of their members in the collective bargaining process. MCLA 423.211; MSA 17.455(11). The utilization of § 6 remedies results in a significant sanction against the federation, as an organization consisting of its public employee members.[11]

Buttressing the adequacy of the discipline-discharge remedies is the additional fact that traditional injunctive relief, and possible contempt sanctions for violations of such injunctions, are available for dealing with work stoppages by teacher federations and their individual members.

Furthermore, the ultimate legislative goal is to achieve a prompt, fair resolution of disputes while avoiding the disruption of the educational process.

[11] At this writing, it is public knowledge that MERC is in the process of certifying a new bargaining unit for the replacement of teachers hired by the Crestwood School District. The Crestwood Education Association ceased to exist upon the firing of its teacher-members. The Michigan Education Association has refused to become involved in organizing the new teachers.

To recognize alternative tort remedies would result in a substantial negative impact upon such purposes. It would encourage future school board inaction. Eventual settlements could be prolonged pending the resolution of multiple tort claims and counterclaims. The inevitable result would be to create labor law logjams in our courts and, at the same time, to exacerbate labor-management disputes.

Next, while we have already discussed the policy implications involved in circumventing the PER-A's (MERC's) jurisdiction to determine unfair labor practice charges, we believe there exist even more significant policy reasons for rejecting the cause of action pled.

Courts venture into dangerous and basically unchartable waters when they "tinker" with existing legislative schemas such as the PERA. The precarious and uneasy balance of labor-management power which exists in the public labor relations sector could be easily upset. Neither law nor reason gives basis for any additional modification of the Legislature's exhibited intent to limit remedies available in this situation.

In a recent Federal decision, which involved a proposed statutory cause of action regarding principles similar to those in the case at bar, the Southern District Court of Florida spoke to the policy considerations at issue here:

"The life cycle of labor-management bargaining is heated and oftentimes results in bitter accusations. Representatives attempt to secure the best possible terms for their respective sides. To create a right of action in favor of an employer against a union and its collective bargaining representatives for losses the former incurs in the course of the collective bargaining process would, in effect, give the employer a weapon

with which to keep the unions and their agents 'in line'. Surely, neither Congress nor the Appellate Courts would fashion a remedy which would give the employer a lever upon which to gain such an unfair advantage." See *National Airlines, Inc, v Pilots Association,* 431 F Supp 53 (SD Fla, 1976).

As early as 1969, the Michigan Law Review, in its comments *Collective Bargaining for Public Employees and the Prevention of Strikes in the Public Sector,* anticipated and rejected the very cause of action pled by the school district:

"A possible cost-equalization approach is to allow damage suits by the employer against the union. Such an approach, however, far from promoting a balance of bargaining between the parties, would probably only aggravate any existing imbalance. In situations in which the union possesses the preponderance of power, the employer would be unlikely to invoke the damage remedy for fear of exacerbating relations; and when the employer holds the power, the availability of such a further remedy would merely increase his advantage." 68 Mich L Rev 260, 293 (1969).

Justice Douglas, in his eloquent dissent in *Laburnum, supra,* 670–671, also discussed the long-range policy implications of allowing either employers to sue unions or unions to sue employers for alleged tortious conduct which might occur during labor disputes. He believed that such suits, if allowed, would seriously undercut the LMRA:

"That Act subjected these industrial disputes to settlement and adjudication in administrative proceedings. For example, the administrative agency was granted power to forbid employers from interfering with trade-union activities. May a union not only institute proceedings before the National Labor Relations Board but sue the employer as well? Or may it have a choice of

remedies? I would think not. But if the union may not sue the employer for the tortious conduct, why may the employer sue the union?

"I think that for each wrong which the federal Act recognizes the parties have only the remedy supplied by that Act—and for a simple reason. The federal Act was designed to decide labor-management controversies, to bring them to a peaceful, orderly settlement, to put the parties on the basis of equality which the rules designed by Congress envisaged. If the parties not only have the remedy Congress provided but the right to sue for damages as well, the controversy is not settled by what the federal agency does. It drags on and on in the courts, keeping old wounds open, and robbing the administrative remedy of the healing effects it was intended to have."

Finally, when this Court considers the added dimension of reinvolving the circuit courts in such volatile litigation as labor-management disputes in the public sector, we can only conclude that we would be opening a veritable Pandora's box were we to judicially create the cause of action urged by plaintiff school district.

## VI—CONCLUSION

Therefore, we conclude, as did the Court of Appeals, that barring legislative fiat, we will not judicially create a civil damage action in tort against a teachers' federation (union), or its agents, where the federation may have precipitated a peaceful strike in violation of the statutory prohibition of the PERA:

"A court, in law or equity, may indeed enter all appropriate orders, but only those consistent with the proper discharge of its judicial responsibility. It has been said that there is not a judicial remedy for every wrong or shortcoming in society or in a statutory

scheme. The Legislature has left the resolution of collective bargaining impasses in limbo and there the matter shall remain until it chooses to act." *Rockwell, supra,* 646.

Affirmed. No costs, a public question.

Kavanagh, C. J., and Williams and Fitzgerald, JJ., concurred with Blair Moody, Jr., J.

Levin, J., concurred in Part II of the opinion.

Coleman, J. *(concurring).* I concur in the holding that § 6 of the public employment relations act (PERA), MCLA 423.201 *et seq.;* MSA 17.455(1) *et seq.,* applies to the facts of this case.

Ryan, J., concurred with Coleman, J.