**STATE of Missouri, ex inf., John ASHCROFT, Respondent,**

v.

**KANSAS CITY FIREFIGHTERS LOCAL NO. 42, et al., Appellant.**

**No. WD 33928.**

Missouri Court of Appeals,
Western District.

May 1, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied May 29, 1984.

Application to Transfer Denied July 17, 1984.

Joseph W. Moreland, Blake & Uhlig, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Robert L. Presson, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P.J., and SHANGLER and MANFORD, JJ.

SHANGLER, Judge.

This appeal is from a judgment taken by the State of Missouri against the membership of Kansas City Firefighters Local No. 42, an unincorporated association, as a defendant class. The petition was on a theory of tort to recover damages occasioned to the State by the activation of the National Guard to perform the function of the Kansas City Firefighters during a period of illegal strike. The court entered a judgment for compensatory [$128,782.72] and punitive [$25,000.00] damages.

The appeal questions (1) the validity of the action procedure which issued in judgment (2) the award of punitive damages against the association Kansas City Firefighters Local No. 42, *eo nomine*, (3) that the law imposes any duty upon public employees—answerable in tort for the breach—for consequences of a strike and (4) the reimbursement to the State Treasury for the expense of the militia in view of the provision of statute that such costs shall be paid from general revenues.

The judgment we review was rendered on a petition amended to plead a recovery in tort. It was a sequel to a judgment rendered on a petition of quasi-contract, but reversed by this court in *State ex rel. Danforth v. Kansas City Firefighters Local No. 42,* 585 S.W.2d 94 (Mo.App.1979). That decision gave opinion that there was no proof that the militia services by the State of Missouri, albeit done in the discharge of a performance of duty owed by another [Local No. 42], were rendered with any expectation of pay—an essential element of the species of quasi-contract [*Negotiorum Gestio*] asserted for recovery. The petition on remand was amended to plead that the act of strike by the Firefighters against the governmental employer was illegal and tortious, so that the call to the militia by the proclamation of the Governor to protect against the hazards of life and property created by the refusal of the Firefighters to function was a foreseeable consequence of that unlawful conduct

and entitled the State of Missouri to recover damages.

The petition for damages, as was the petition on quasi-contract, was brought by the Attorney General for the plaintiff State of Missouri against thirteen [later reduced to twelve] named officers and executive board members as representatives of the defendant class: Kansas City Firefighters Local No. 42. The cause of action on the amended petition for tort, as on the original petition for quasi-contract, was submitted on stipulated facts, depositions and exhibits.

The salient evidence discloses that the Kansas City Firefighters Local No. 42 is an unincorporated association, and that at the time of the strike event, consisted of the enumerated members, all employed by the City of Kansas City as the municipal fire department. In August of 1973, Local No. 42 notified the City that a dispute and impasse subsisted between them [as defined in a Memorandum of Understanding executed earlier that year]. The prominent disagreement was on the question of parity of pay between the municipal firefighters and policemen. The federal mediation was to no avail, nor did two successive fact-finding panels resolve the issue. The executive board of Local No. 42 concurred in the decision to strike the City or to a work stoppage tantamount to strike to commence on October 3, 1975. The majority of the board, president Shortino and secretary Walsh among them, recommended to the membership of the Firefighters union local that they vote a strike. The membership of the Firefighters met on September 30 and October 1, 1975, with some dissent, agreed to cease performance of the firefighter duty and to strike the city. The defendants Shortino and Walsh, president and secretary, released an open letter from Local No. 42 to the citizenry of the municipality of the intent to strike on the morning of October 3, 1975.

The day before that threatened action, the City obtained a temporary restraining order to prohibit the firefighters from the strike. That order notwithstanding, the firefighters struck. The firefighters refused to report for duty, refused to respond to fire alarms, and refused to maintain the equipment. The executive board, as prelude to the strike action, sought and received commitments from other area professional firefighters not to enter the city limits to deal with fire or other emergency. Thus, from October 3, 1975, the city was without recourse to a professional firefighter force adequate to the protection of the life and property of the city populace of 490,000 persons. On the morning of the strike, the fire stations were secured by members of the municipal police department and the police vehicles were equipped with fire extinguishers.

This condition of emergency was reported to the Governor of Missouri by the city officials and on October 3, 1975, by proclamation, the Governor ordered the state militia into emergency duty under the authority of § 41.480, RSMo 1978. The strike ended on October 7, 1975, and the service of the militia ended concurrently. The militia incurred $128,782.72 in expenses during that emergency period, and those obligations were met from the gross sum of $500,000 appropriated by the General Assembly for such emergency purposes. The State of Missouri sued for reimbursement from the union membership as well as for an award of punitive damages. The court responded in judgment.

The amended petition sounds in tort—the tort of intentional wrong. The labor union defendants contend that the judgment rests neither on any developed principle of common law nor of statutory right. They urge, rather, that reasons of sound policy compel a court to remain neutral between protagonists in the public employment sector, and that to fashion a remedy in damages as redress for consequences of concerted employee activity inevitably embroils a court in an intricate competition of interests more tractable to the legislative function. They posit, in effect, that any damage from public employee strikes, albeit an unlawful activity, is *damnum absque injuria* unless such a liability is im-

posed by positive legislative act. The plaintiff State of Missouri asserts that strike by public sector employees is unlawful both under the common law and statute [§ 105.-530] and that each engenders a remedy for damages: the traditional forms of action from the one, and the implied right of a civil redress from the other.

■ The early common law treated concerted worker activity to raise wages first as a criminal conspiracy, and then as a civil conspiracy, and so unlawful *per se.* The theory, in that era of *laissez-faire*, was that although a combination of capital for the purpose of trade and competition was a legitimate end, a combination of workers to raise wages was a harm to the employer, and so was an unjustified activity. That view, however, never took hold in American courts. M. Forkosch, A Treatise on Labor Law, Chapter IX (2d ed. 1965). It was the forceful opinion rendered by Chief Justice Shaw in *Commonwealth v. Hunt*, 45 Mass. (4 Met.) 111 (Sup.Jud.Ct.1842), rather, which announced the authoritative principle, now uniformly held in our courts, that a labor union is *per se* a lawful concert, and may pursue measures for self-betterment of the members even at the expense of the gains and profits of the employer. The legality of combination, therefore, is no longer impaired by worker self-interest pursued at the expense of the employer, unless the object of the activity or the means used are not lawful. *Adams Dairy v. Burke*, 293 S.W.2d 281, 288[4] (Mo.1956). The right of workers "to organize and to bargain collectively through representatives of their own choosing" to gain these ends is now conferred by the Bill of Rights of the Missouri Constitution of 1945 [Article I, § 29]. That provision however, applies only to employees in the *private sector*, and not to public employees. *Sumpter v. City of Moberly*, 645 S.W.2d 359, 361 (Mo. banc 1982). The *public employees* may require the governmental employer to "meet, confer and discuss" proposals as to terms of employment, but not to agree. [Public Sector Labor Law § 105.520, RSMo 1978]; *State ex rel. Missey v. City of Cabool*, 441 S.W.2d 35, 41[2–5] (Mo.1969).

■ The early common law, as a cognate to the theory of conspiracy, also prohibited strikes against *any* employer, *private or public.* Note, *Private Damage Actions Against Public Sector Unions for Illegal Strikes*, 91 Harv.L.Rev. 1309, 1310, n. 5 (1978); R. Gorman, Basic Text on Labor Law 1–2 (1976). That restraint was ameliorated as to *private employees* by the Clayton Act in year 1914, and the principle has since become a general tenet of labor law. 1 Lab.L.Rep. (CCH) ¶ 1426 (1972). Thus, the members of a union may use strike, picket, boycott, or other peaceful means in concert to gain a lawful employment objective. *Fred Wolferman, Inc. v. Root*, 356 Mo. 976, 204 S.W.2d 733, 735[2] (Mo. banc 1947). The common law rule that *public employees* may not strike, however, continues to obtain. A preponderance of the jurisdictions, the federal government and Missouri among them, rather than annul, have confirmed the common law prohibition by legislative enactment. Note, *Damage Liability of Public Employee Unions for Illegal Strikes*, 23 B.C.L.Rev. 1087 (1982). Thus, § 105.530 provides: "Nothing contained in sections 105.500 to 105.530 [the Public Sector Labor Law] shall be construed as granting a right to employees covered in sections 105.500 to 105.530 to strike." A public employee in our state, therefore, is prohibited from the strike by the ban of the common law as reinforced by statute. *School District of Kansas City v. Clymer*, 554 S.W.2d 483, 486[1] (Mo.App.1977); *St. Louis Teachers Ass'n v. Board of Education*, 544 S.W.2d 573, 575[1] (Mo. banc 1976).

The developed law allows a party who suffers business or property loss from an unlawful strike by a union of *private employees* to recover damages in recompense. 3 Lab.L.Rep. (CCH) ¶ 5255 (1972); *Adams Dairy, Inc. v. Burke*, 293 S.W.2d 281, 288[4] (Mo.1956). In such case, the injury is redressed on the principle of tort law that one who intentionally causes harm to another is liable if that conduct is generally culpable and not justifiable under the cir-

cumstances. Restatement (Second) of Torts §§ 870, 871 (1977). Legislatures enacted sanctions against unions of *public employees* for unlawful strike, but the measures—fine, injunction and others—are at the instance of the public employer, and not of a third party. Note, *Private Damage Actions Against Public Sector Unions for Illegal Strikes*, 91 Harv.L.Rev. 1309, 1311–12 (1978). Those several state enactments which allow a damage remedy, limit redress to the public employer and employee *inter sese*, and do not endow a claim to a third party.[1] Note, *Damage Liability of Public Employee Unions for Illegal Strikes*, 23 B.C.L.Rev. 1087, 1090 (1982); Wohlers, *One Strike and You May be Out: The Legal Realities of the Hardball Game of Fire Fighter and Police Strikes*, 15 Idaho L.Rev. 39, 53 (1978). Those interspersed jurisdictions which acknowledge a theory of recovery for damages against a public employee union for illegal strike allow the cause of action on principles of the common law—that is, as a right independent of statute or as a right implied by the policy, rather than invested by the terms, of statute.

The contentions on appeal pose the question, altogether new, whether our law allows—in addition to the traditional injunction, contempt and penalty sanctions already available—a civil remedy for damages against a labor union to redress a strike by public employees.

The occasional adjudications to address the question are as variant as the distinctive bent of judicial policy or legislative directive which informs them. Those decisions which accede to a remedy fashion recovery on several diverse theories: tortious interference with contract [*Pasadena Unified School District v. Pasadena Federation of Teachers*, 72 Cal.App.3d 100, 140 Cal.Rptr. 41 (1977)]; public nuisance [*Caso v. District Council 37*, 43 A.D.2d 159, 350 N.Y.S.2d 173 (1973)]; and *prima facie tort* [implicitly approved in *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 451 N.E.2d 459, 464 N.Y.S.2d 712 (1983)] or the *per se* tort [the distinctive California cause of action—*Pasadena*, supra]. Those decisions which deny common law damage invoke the design of the statute to preempt the subject of sanctions for unlawful public strike [*Lamphere Schools v. Lamphere Federation of Teachers*, 400 Mich. 104, 252 N.W.2d 818 (1977)] or simply avow a reticence to interpose the coercive power of the court in the economic competition between public employer and employee [*Burke & Thomas, Inc. v. International Organization of Masters*, 92 Wash.2d 762, 600 P.2d 1282 (banc 1979)]. A third and distinct genre of decisions dis-

---

**1.** Two enactments expressly invest both the public employer or public union a damage cause of action for *breach of* the collective bargaining *contract* by the other: Iowa Code Annotated § 20.17[5] (West 1978); Kentucky Revised Statutes § 345.100[3] (1977).

Five enactments enable the employer to sue the public union in *actions at law* for illegal strike or other unfair labor practice as defined by the distinctive statute. Some of them invest the public union with a reciprocal right.

Minnesota Statutes Annotated § 179.68.1 (West Supp.1983) enables any employer or employee union to sue for *damages* caused by the unfair labor practice of the other. A strike by public employees is defined by Minn.Stat.Ann. § 179.68.3[11] (West Supp.1983) as an unfair labor practice.

New Hampshire Revised Statutes Annotated § 273–A:15 (1977) enables actions for *damages* by a public employer (and perhaps others) against a public employee organization. A prior section declares public employees strikes illegal [and, presumably, a cause for an action for damages].

Indiana Code Annotated § 20–7.5–1–14(b) (Burns 1975) interdicts as unlawful the strike by any *school employee or organization* against a *school employer* and vests the school employer with an *action at law* for redress.

Wisconsin Statutes Annotated § 111.89(2)(c) (West 1974) allows the state employer to sue for *damages* for the strike activity of state employees.

Florida Statutes Annotated § 447.505 (West 1981) bans strike by a public employee or employee organization and § 447.507[4] subjects the employee organization to liability for *damages* to the public employer for violation—the judgment to be enforced by attachment of "union initiation fees or dues which are to be deducted or checked off by public employers."

There is no reported decision of adjudication on any of these provisions of the several statutes which enables damage actions.

allows recovery, not from want of a common law remedy or from antipathy of statute, but because the interest of the suitor—in each case a member of the public—was too remote an effect of the public strike. *Fulenwider v. Firefighters Ass'n Local Union 1784*, 649 S.W.2d 268 (Tenn.1982); *Jamur Productions Corp. v. Quill*, 51 Misc.2d 501, 273 N.Y.S.2d 348 (N.Y.Sup.Ct. 1966).

## PART I

### The Judgment in Tort for Illegal Strike by the Firefighters

The judgment of the circuit court awards the State of Missouri damages on the theory of intentional tort. The findings of fact and conclusions of law cast the award in the generic terms of a harm inflicted with wilfulness and intention and with knowledge of the consequences: they posit that the refusal by the Firefighters to respond to the employment duty conjoined with commitments solicited and received by the Firefighters from the other professionals in the environs not to enter the city to fight fires or respond to emergencies during the strike was done with intention to leave the populace of the city without defense to the · risk of fire, and that conduct [and other enumerated acts] was in defiance of a court injunction and with knowledge that a public strike was unlawful as in violation of Public Sector Labor Law § 105.530 and of the common law; they posit also that the only resource to allay the danger to the public safety was the Missouri National Guard, activated for the purpose by the Governor, and that cost to the State for the performance of these services was a direct result of the unlawful strike by the defendant Firefighters. The conclusion of law then declares that the Firefighters conduct was a wilful and intentional violation of the law and of the employment duty as preface to the award of punitive damages.

The judgment was responsive to the pleadings, also cast in generic terms of an intentional tort. The sufficiency of the pleadings to sustain a tort recovery is not in issue. The Firefighters contend that the trial court findings and conclusions do not articulate a cognizable remedy in tort, and so consummate in a judgment nothing more than an aberration: they contend that the Public Sector Labor Law—found by the trial court to bar strikes by public employees—prescribes no civil remedy against infraction, so that the equitable powers of the court remain the exclusive means of redress. The State of Missouri responds with the essential argument that the judgment merely gives effect to a civil cause of action for damages implied by the Public Sector Labor Law—and particularly the ban of § 105.530 against strike: the State likens the right thus created to the *per se* rule of liability from the breach of a statute current in California and given most prominent application in the labor law decision, *Pasadena Unified School District v. Pasadena Federation of Teachers*, 72 Cal. App.3d 100, 140 Cal.Rptr. 41 (1977).

The labor-management relations in the public sector of Missouri are governed by §§ 105.500 to 105.530 [the Public Sector Labor Law]. The enactment [§ 105.500] defines *public body* in expansive terms to include the State of Missouri [and other enumerated officers and administrative components of the state] and any other political subdivision of or within the state. That section also defines *appropriate unit* and *exclusive bargaining representative* and refers disputes *as to those issues* [§ 105.525] to the State Board of Mediation. The employees of a public body are granted [with exception] the right to form and join labor organizations and to present proposals to a public body, through a representative of choice, as to wages and conditions of employment. The public employees excepted from this grant of right may form benevolent, social or fraternal associations to the same end. The public body is enjoined to *meet, confer* and *discuss* a proposal as to wages and conditions of employment presented by the exclusive bargaining representative of the labor organization [§ 105.520]. The final section [§ 105.530] declares that "Nothing contained in sections 105.500 to 105.530 shall be construed

as granting a right to employees covered in sections 105.500 to 105.530 to strike."

The plenary enactment makes no provision for enforcement of the several provisions, creates no mechanism for its administration [other than to refer the questions of *appropriate unit* and *exclusive bargaining representative* to the State Board of Mediation], and imposes no penalty for strike or other infraction. These are left to the traditional functions of the court. *See* Loevi, *The Development and Current Application of Missouri Public Sector Labor Law*, 36 Mo.L.Rev. 167 (1971); *see also City of Columbia v. Missouri State Board of Mediation*, 605 S.W.2d 192 (Mo.App. 1980); *State ex rel. Missey v. City of Cabool*, 441 S.W.2d 35 (Mo.1969).

The Firefighters contend that no remedy for damages may be allowed for a strike by public employees because the Public Sector Labor Law expresses none, and because the existent judicial remedies are sufficient for the purpose. To support argument, the Firefighters cite *Lamphere Schools v. Lamphere Federation of Teachers*, 400 Mich. 104, 252 N.W.2d 818 (1977) where the public employer sought damages from a union of public school teachers because of an illegal strike. That decision refused the public employer a civil remedy for damages, not because there was no express grant by statute, but because the subject matter of unfair labor practice had been relegated by the Michigan Public Employment Relations Act to the Employment Relations Commission and conferred on that body the exclusive prerogative of sanctions for illegal strike. The court discerned from the statement of policy preamble to the Act [1.c.821[1–5]]:

"AN ACT to prohibit strikes by certain public employees; to provide review from disciplinary action with respect

thereto ... and *to prescribe means of enforcement and penalties for the violation of the provisions of this act* that no remedy—in tort or otherwise—accumulated for the strike infraction other than the sanctions [termination of employment and other discipline] defined in the Act. [To comparable effect is the West Virginia statute in *City of Fairmont v. Retail, Wholesale, and Department Store Union*, 283 S.E.2d 589 (W.Va.1980)].

■ In contrast to the Michigan and other schemes for comprehensive public employments,[2] our Public Sector Law declares no policy, provides no administrative controls, and imposes no sanctions for infraction. These exercises are left to the judicial *tertium* of government. Thus, the Law merely withholds the strike from public employees: "[n]othing in [the Law] shall be construed as granting a right to employees covered in [the Law] to strike" [§ 105.530], but does not expressly declare a strike unlawful. That discernment of legislative policy is an extrapolation delivered by the courts. *St. Louis Teachers Ass'n v. Board of Education*, 544 S.W.2d 573, 575[1–2] (Mo. banc 1976); *State ex inf. Danforth v. Kansas City Firefighters Local No. 42*, 585 S.W.2d 94, 98[6, 7] (Mo.App. 1979). Thus, also, the administration of unfair labor practice complaints under the law has been assumed by the judicial department, rather than confided by the legislature to the preemptive jurisdiction of an agency. *State ex rel. Missey v. City of Cabool*, 441 S.W.2d 35, 41[2–5] (Mo.1969); *City of Webster Groves v. Institutional and Public Employees Union*, 524 S.W.2d 162, 165[1–4] (Mo.App.1975). Thus, also, the sanctions for breach of legislative provisions—not elsewhere invested—are also left to the judiciary. *City of Grandview v. Moore*, 481 S.W.2d 555, 557[1, 2] (Mo.App. 1972).

**2.** The typical public employment labor statute commences with a "statement of policy" that the purpose of enactment [among the others] is "to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government." N.Y.Civ.Serv.Law § 200 [The Taylor Law §§ 200–214] (McKinney 1973); also: Fla.Stat.Ann. § 447.201 (West Supp.1978);

Iowa Code § 20.1 (1975); Minn.Stat. § 179.61 (1976); Tex.Rev.Civ.Stat.Ann. art. 5154c–1, § 2(b)(1) (Vernon Supp.1978); Wash.Rev.Code § 41.56.430 (Supp.1977). Some of these enactments contain separate provisions for essential public employees—such as Firefighters; for instance, Chapter 4 of the California Labor Code §§ 1960–1962 (1971).

The contention by the Firefighters that no civil remedy for damages obtains because the Public Sector Labor Law endows none, therefore, does not follow as of course: that the legislature relinquished to the courts to declare the policy, administer the law, and give remedy for breach implies, rather, an intent also that the courts fashion a private cause of action to give full effect to the policy of the enactment— especially where the judicial sanctions available do not suffice for the purpose. The cognate contention that the present procedure available to a court to enjoin an unlawful strike [and other infractions, *see City of Grandview v. Moore*, supra] argues a fallacy: sanctions already available to the court obviously do not suffice, the Firefighters strike was in the face of injunction.

■ The primary policy implicit in the Public Sector Labor Law is to ensure the uninterrupted provision of services to the public vital to its health, safety, morals and welfare.[3] To that end, the strike is withheld from public employees [§ 105.530], to that end the exercise of the strike by public employees has been declared illegal under the statute [*St. Louis Teachers Ass'n v. Board of Education*, 544 S.W.2d 573 (Mo. banc 1976)], and to that end other protest by public employees which impair the public health or safety is enjoinable [*City of Webster Groves v. Institutional and Public Employees Union*, 524 S.W.2d 162, 166[8–11] (Mo.App.1975)]. The Public Sector Labor Law, as we note, makes no provision for sanctions for violation by strike or otherwise, but implicitly consigns that exercise to the traditional equity jurisdiction of the courts. The plaintiff State of Missouri contends that the Public Sector Labor Law implies a private remedy in tort as well to a party damaged by public employee activity in violation of the law—in this case, by strike.

■ The doctrine of implied rights describes the principle [Restatement (Second) of Torts § 874A (1977)]:

When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, *the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analagous to an existing tort action.* [emphasis added]

That is merely to apply the common law maxim: *Ubi ius, ibi remedium* —Where there is a right, there is a remedy. The essential doctrine is a precept of our law. *Christy v. Petrus*, 365 Mo. 1187, 295 S.W.2d 122, 126 (banc 1956); *Lowery v. Kansas City*, 337 Mo. 47, 85 S.W.2d 104, 108[8–12] (1935); Restatement (Second) of Torts § 874A, comment c (1977).

The creation of a new civil cause of action independent of an existent common law remedy, under this rule, will be implied when such appears "to have been the legislative intent." *Christy v. Petrus*, supra, 1.c. 126[6]. An explicit legislative direction to preclude a civil remedy, of course, concludes a court. There is no such expression in the Public Sector Labor Law. On the contrary: the Law prescribes neither remedy for enforcement nor sanctions for violation. These are left to the court. The legislative history of the Law from original enactment in 1965 through the amendments of 1967 and 1969 confirm the purpose of the legislators to leave enforcement and sanction alike to the judiciary. *See* Loevi, *The Development and Current Application of Missouri Public Sector Labor Law*, 36 Mo.L.Rev. 167, 173 *et seq.* (1971); *Curators of University of Missouri v. Public Service Employees Local No. 45*, 520 S.W.2d 54 (Mo. banc 1975); *State ex*

---

**3.** The other, cognate, primary policy of the statute is to vouchsafe to public employees a means to acquit the right conferred by the United States and Missouri Constitutions of peaceable assembly and to petition for redress of grievances. *Curators of University of Missouri v. Public Service Employees Local No. 45*, 520 S.W.2d 54, 57 (Mo. banc 1975).

*rel. Missey v. City of Cabool,* 441 S.W.2d 35 (Mo.1969). This relinquishment, we must assume, was with awareness of the traditional authority of a court to fashion a civil remedy to aid enforcement of the policy of the legislation. Gamm & Eisberg, *The Implied Rights Doctrine,* 41 U.M.K.C. L.Rev. 292, 296 (1972). In the terms of Restatement (Second) of Torts § 874A comment d (1977):

> [T]he figurative search for legislative intent involves looking for the policy behind the legislative provision, attempting to perceive the purpose for which it was enacted, and then, having ascertained that policy or purpose, determining the most appropriate way to carry it out and identifying the remedy needed to accomplish that result.

A primary policy of the Public Sector Labor Law, we iterate, is to ensure the uninterrupted delivery of services vital to the public welfare. A strike by firefighters poses an inherent and immediate threat to the public safety—and the particular action by Firefighters Local 42, taken in concert with the firefighter professionals in the environs, exposed the municipal populace to an irremediable danger. It is evident that the injunction and other exercises of the equity court were not sufficient to vouchsafe the policy of the enactment. A remedy for damages cumulative to those already available to a court would serve to ensure the integrity of the firefighter function essential to public safety and deter the almost certain risk of harm to persons and property the disruption of that service entails.

 To enjoy status to sue on a cause of action implied by the policy of a statute, however, the suitor must be a member of the class for whose especial benefit the statute was enacted. Restatement (Second) of Torts § 874A comment i (1977); *Texas & Pacific Ry. Co. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed.

874 (1916). The text of the Public Sector Labor Law discloses that the prohibition against strike by public employees was enacted for the benefit of the *public body* [§ 105.500]—that is, the public employer. It is at least to the public employer, therefore, that the private cause of action for damages accrues. The plaintiff here, the State of Missouri, stands in the stead of the municipal public employer not as a third party but, as its surrogate to any cause of action under the statute.[4]

The defendants Firefighters acknowledge that the Public Sector Labor Law bans strike by public employees, but contend nevertheless that to imply a private cause of action in tort for violation of that policy would not promote labor peace, but exacerbate dispute. They argue that to create a private cause of action for any third party affected by a public strike would impose a catastrophic financial burden on the employer as well as on the employee, and would open the courts to a flood of litigation. They contend that available remedy suffices to discipline any violation of the Law, and that the complex issues of labor relations are not amenable to ultimate judicial solution.

We answer that the traditional injunction, fine and contempt remedies have not deterred the public strike in areas of vital concern—as this instance demonstrates. A private cause of action will impose a cost the decision to strike must reckon with. That rule of liability no more augurs catastrophe than any other tort done with the intention to produce harm. Nor does the ambit of liability presage an unmitigated flow of lawsuits. We need not, and do not, decide whether the policy of the Public Sector Labor Law benefits a third party other than the public employer. The State of Missouri, in these singular circumstances, in emergency provided the fire protection services usually incumbent upon a mu-

---

**4.** The damages the State of Missouri contends for are for the expenditures incurred to maintain and operate the State militia as firefighters in Kansas City during the continuance of the strike. The militia was activated to that purpose by the proclamation of the Governor under

§ 41.480, RSMo 1978, after emergency request by the municipal mayor and advisement that the firefighters strike threatened a public catastrophe and was beyond the resources of local government to deal with.

nicipality to furnish, and so stands in the stead of the city and sues in its stead. The State does not ask to recover damages of a kind distinct from those accruable to the public body, but presumptively, only for the expenditures the municipality itself would have incurred to protect against fires during the period of strike—had the resource been available to the city. We do note that those legislatures to enact on the subject limit the cause of action to the favor of the *public employer* or to the employer and employee—but not to benefit of a third party. [*See* supra, note 1]. Those few decisions on the question limit recovery to the public employer [*Pasadena Unified School District v. Pasadena Federation of Teachers*, 72 Cal.App.3d 100, 140 Cal.Rptr. 41 (1977)] and deny damages to third parties on claims for loss from an illegal public strike as assertions of interest both remote and incidental [*Jamur Productions Corp. v. Quill*, 51 Misc.2d 501, 273 N.Y.S.2d 348, (N.Y.Sup.Ct.1966); *Fulenwider v. Firefighters Ass'n Local 1784*, 649 S.W.2d 268 (Tenn.1982); *Burke & Thomas, Inc. v. International Organization of Masters*, 92 Wash.2d 762, 600 P.2d 1282 (banc 1979)]. These decisions apply the tort principles of foreseeability and causation to draw the ambit of liability. Thus, a plaintiff who claims damages from the intentional tort of an illegal public strike must still prove a legally sufficient relationship between the illegal act and the

injury: that is, the plaintiff must show that the injury was foreseeable and in fact resulted from the illegal conduct. Restatement (Second) of Torts § 870, comment 1 (1977); Restatement (Second) of Torts § 874A, comment k (Tent.Draft No. 22, 1976).

We agree that sound judicial policy prompts that a court refrain from a rampant exercise of its coercive power in this delicate area of public employment. It is for that reason that we confine our analysis to the public employee function in suit—firefighters. To be sure, a strike by *any* body of public employees violates § 105.530 and is for that reason illegal. We do not confront, however, whether every violation of the ban of that statute *ipso facto* vests a cause of action for damages to the public employer—not to say a third party.[5] Whether or not a statute implies a civil remedy in favor of the class it benefits, as we note, does not depend solely upon the violation of the statute to the detriment of the class, but whether the text or policy of the statute endows the cause of action for the breach. *Christy v. Petrus*, 365 Mo. 1187, 295 S.W.2d 122, 126[3–5] (banc 1956); Restatement (Second) of Torts § 874A (1977). The firefighter function involves services inherently critical to the public safety so that any interruption, however short, poses a clear and present danger to the public welfare.[6] [It is a danger, moreover, exacerbated by the total lack of sub-

---

5. The *per se* tort—that is, liability on a civil cause which arises *per se* from the violation of a statute—without prior resort to policy or intent of the statute, is a theory of recovery founded in California law. On this principle, the illegality of the public strike itself suffices to vest a private cause of action for damages. That was an alternative theory of recovery allowed in *Pasadena Unified School District v. Pasadena Federation of Teachers*, 72 Cal.App.3d 100, 111, 140 Cal.Rptr. 41, 48 (1977) by a public employer against a public employee union for damages from a strike. The continued validity of that alternative basis for recovery, however, has since been placed in doubt by the continued refusal of the California Supreme Court in bank to declare that a strike by public employees is illegal under the statute. *San Diego Teachers Ass'n v. Superior Court*, 24 Cal.3d 1, 593 P.2d 838, 897, 154 Cal.Rptr. 893 (1979); *El Rancho Unified School District v. National Education*

*Ass'n*, 33 Cal.3d 946, 663 P.2d 893, 192 Cal.Rptr. 123, 130 (bank 1983). The entire rationale of *Pasadena* is also cast into doubt by the *El Rancho*, supra, determination that the Education Employment Relations Act invested the Public Employees Relation Board with the primary jurisdiction to determine what sanctions, if any, a strike would warrant and that such determination preempted the power of a court to give a tort remedy for that conduct.

6. That public employee firefighters are aware of this essential role is attested to by the renunciation of strike firefighters and police formally observed as a self-imposed discipline until quite recently. *See* Wohlers, *One Strike and You May Be Out: The Legal Realities of the Hardball Game of Fire Fighter and Police Strikes*, 15 Idaho L.Rev. 39 (1978).

stitute service from the private sector—as the municipal invitation for the militia to intervene shows.] Thus, the very fact of a firefighter strike not only violates the prohibition of § 105.530, but also the policy of the Public Sector Labor Law to prevent disruption of vital governmental services.

 This analysis transposed to legal principle means: a strike by firefighters public employees in the face of the ban of § 105.530 is an intentional act of violation and gives rise, as we conclude, to a claim for an intentional tort. "An intentional tort is one in which *the actor intends to produce the harm that ensues; it is not enough that he intends to perform the act.*" Restatement (Second) of Torts § 870, comment b (1977) [emphasis added]. That the harm as well as the act must have been intentional to prove a cause of action for intentional tort is a principle firmly grounded in our law. " 'A voluntary act may result in injury to another, but it is only when *the harm* is intentionally inflicted that there is a "wilful" tort.' " *Rector v. Tobin Construction Company,* 377 S.W.2d 409, 414 (Mo. banc 1964). An even more succinct statement of principle is: it is "the intent to *injure* and not merely the intent to *act* that must be pleaded and proven." *Wilt v. Kansas City Area Transportation Authority,* 629 S.W.2d 669, 672[5] (Mo.App.1982). A cognate principle also obtains: "[The actor] is treated as intending that consequence [harm] if he knows or believes that the consequence is certain, or substantially certain, to result from his act." Restatement (Second) of Torts § 870, comment b (1977). That principle is also grounded in our law. " 'When an intentional act results in injuries which are the natural and probable consequences of the act, the injuries as well as the act are intentional.' " *Truck Insurance Exchange v. Pickering,* 642 S.W.2d 113, 116[1] (Mo.App.1982).

To interpolate the policy of the Public Sector Labor Law in terms of the cause of action for intentional tort that policy yields: it is not the violation alone [by strike] which fastens liability upon the public em-

ployees, but the intention that harm to the public employer shall result. It is not the illegality alone [as the State would have it] which proves the tort and a legal injury, but that the harm actually suffered was intended—or so certain a consequence of such conduct—as to amount to a harm intended. In the case of a governmental service essential to the public safety—such as the firefighter function—the proof that the strike [the intentional act] intended harm to the public body is virtually presumed. The very proofs the cause of action for intentional tort requires, therefore, delimits the scope of liability for illegal strike to harm actually intended or foregone as a consequence of the conduct, and so dispels concern that to give a civil remedy imperils the continued life of public employee labor organizations.

The question remains: what nomination of intentional tort does the policy of the statute imply for the consequences of a public employee strike?

A civil remedy implied from a statute will be assimilated into the form of a traditional common law tort or, when such a similarity of category lacks, an entirely new unnamed tort will be fashioned to give effect to the legislative policy. Restatement (Second) of Torts § 874A (1977). In the case where the liability is for an intentional infliction of harm, and where culpability rests upon whether there was justification for the act, the unnamed form of action goes by the innominate designation, prima facie tort. Restatement (Second) of Torts § 870, comment a (1977). The nature of the remedy in every event will depend upon the desideratum of the statute. Those few decisions which treat the common law liability of public employees for strike entertain theories of tortious interference with contract, nuisance and the *prima facie tort.* In addition, California recognizes a distinctive remedy—the *per se* tort. These decisions, however, do not arrange into any systematic order to aid our inquiry as to the form the cause of action for illegal strike shall assume. That is because most of the litigation involves

claims by a party extraneous to the public employer and employee relationship.[7] They entail issues we do not confront: whether—in the light of the strike ban of the particular statute and other distinctive circumstances—the statutory prohibition was intended to benefit someone other than the public employer and, if so, whether the claimant was among the class contemplated.

There are only occasional reported litigations by a public employer to recovery for the effects of a strike in violation of statute by public employees. *Lamphere Schools v. Lamphere Federation of Teachers*, 400 Mich. 104, 252 N.W.2d 818 (1977), as we note, invokes the design of the statute to confer that subject matter upon a labor board to preempt the prerogative of a court to give common law remedy in addition. *City of Fairmont v. Retail, Wholesale, and Department Store Union*, 283 S.E.2d 589 (W.Va.1980), treats the strike by nurses and technician employees of a municipal hospital done peacefully as only a technical "illegality" and so not a basis for a tort action. [We infer that the nonessential nature of the public services interrupted by the strike—and its brief one-day duration—predisposed the denial of damage remedy.]

▆▆▆ The most prominent decision to allow recovery by a public employer against the public employees for damages for a strike in violation of statute [and the precedent the State relies on to sustain recovery] is *Pasadena Unified School District v. Pasadena Federation of Teachers*, 72 Cal. App.3d 100, 140 Cal.Rptr. 41 (1977). The teachers union engaged in strike against the school district despite a subsistent contract between them and in violation of the ban of statute. The school district sued the union for damages on the theory that the strike was a tortious interference of the contract. The appeals court reinstated the petition dismissed by the trial court on that pleaded theory. The opinion determined, moreover, that under the facts alleged, *two* alternative theories of damage recovery were open to the public employer: tortious inducement of breach of contract *and* a direct, *per se* liability, for harm from the strike as an unlawful breach of the statute. The remedy of tortious interference with contract is not open to a Missouri public employer simply because the directive of § 105.520—that the public body and the employee representative meet, confer and discuss wages and other conditions of employment—cannot consummate in a contract which binds the public body. The determination of wages, tenure and work conditions of public employees is a legislative prerogative not subject to delegation

7. *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 451 N.E.2d 459, 464 N.Y.S.2d 712 (1983) denied remedy on an assortment of theories—public nuisance, *prima facie* tort, *per se* tort, tortious interference with business relations—to a group of lawyers who claimed damages for the loss of business from a strike by public transit workers. The court determined that the plaintiffs had no greater interest than the public generally, and so had no cause of action.

*Burke & Thomas, Inc. v. International Organization of Masters*, 92 Wash.2d 762, 600 P.2d 1282 (banc 1979) denied remedy on theories of third-party beneficiaries of the collective bargaining agreement and on tort to owners of resorts for money loss due to the strike of the state ferry system in violation of statute. The court determined that the litigants were not intended beneficiaries of the labor contract and that the strike was not intended to interfere with their business relations with other persons, and so denied relief.

*Fulenwider v. Firefighters Ass'n Local Union 1784*, 649 S.W.2d 268 (Tenn.1982) denied remedy to a property owner for damages for an inadequate response to a fire because of a firefighters strike. The court denied remedy against the public employee union on the basis that the property owner was only incidentally affected by the strike—a "by product of the work stoppage" [l.c. 272[5, 6]]—and so owned no cause of action.

*Jamur Productions Corp. v. Quill*, 51 Misc.2d 501, 273 N.Y.S.2d 348 (N.Y.Sup.Ct.1966) denied remedy to third parties who suffered losses from a transit strike in violation of statute. The theories asserted were assorted contract interference premises, *prima facie* tort, *per se* tort, and even violation of a United Nations declaration. The court determined that the statute intended no civil cause of action for the special benefit of these plaintiffs, nor was the illegal strike activity directed towards third parties. The court determined that the plaintiffs suffered no special injury apart from the public generally and denied relief.

or contract. *Sumpter v. City of Moberly*, 645 S.W.2d 359, 361 (Mo. banc 1982). Nor does the alternative ground of recovery allowed the public employer in *Pasadena* —that the violation of the ban against strike gives right *per se* to a civil cause of action in tort for any consequent damage— suit our law any better. For our law, as well as that of general adherence, makes clear that not every violation of a regulatory statute gives rise to a civil liability to the violator. The courts will not exceed the purpose intended by the legislature: it is only when the enactment intends the cause of action or when the policy of the statute will otherwise stultify that the civil remedy is implied—and then only to a member of the class the statute intends to benefit. Restatement (Second) of Torts § 874A (1977). The public employer has a remedy for the violation of the strike ban by the defendants Firefighters, not *per se* because the strike violates the Public Sector Labor Law, but because the intent of that enactment is to leave the sanctions for violation to the courts and it is only the additional threat of a return of damages which will deter the interruption of vital public services, and hence carry out the policy of the law.

▮▮▮▮▮ Another theory of recovery for illegal strike—sometimes pleaded in litigations and otherwise advocated by academecians—is the public nuisance. [*See, e.g.*, *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 451 N.E.2d 459, 464 N.Y.S.2d 712 (1983); *Fulenwider v. Firefighters Ass'n Local Union 1784*, 649 S.W.2d 268 (Tenn.1982); Note, *Damage Liability of Public Employee Unions for*

*Illegal Strikes*, 23 B.C.L.Rev. 1087, 1127 (1982)]. A public nuisance is any unreasonable interference with the rights common to all members of the community in general and encompasses the public health, safety, peace, morals or convenience. *State ex rel. Collet v. Errington*, 317 S.W.2d 326, 331 (Mo.1958); Restatement (Second) of Torts § 821B (1977). A violation of a statute [such as infraction of a ban against strike by public employees] which involves a significant and intentional interference with the public right constitutes a public nuisance. Restatement (Second) of Torts § 821B(2)(b) & (c) (1977). An invasion of that public right constitutes a species of petty offense abatable, in the usual course, by a public officer. *State ex rel. Lamm v. City of Sedalia*, 241 S.W. 656, 657[2–4] (Mo.App.1922); W. Prosser, Handbook on the Law of Torts § 86 (4th ed. 1971). The public nuisance also becomes a private tort when an individual shows a particular damage of a kind not shared with the rest of the public. *Baker v. McDaniel*, 178 Mo. 447, 77 S.W. 531, 538 (1903). Whatever promise the public nuisance theory portends as a private tort remedy for damage from an unlawful public strike, no reported case grants redress on that premise.[8] Were we to adopt the espoused remedy as a principle of law, the evidence, nevertheless, does not allow the cause of action: the private tort accrues to recompense damage particular to the person and not shared with the general public. The suit by the State of Missouri [in the stead of the municipality] is for recompense for the *public injury*, and does not seek to vindicate a damage distinctive in

---

**8.** A private nuisance, contradistinguished from a public nuisance, is restricted to the invasion of interests in the use or enjoyment of land. It is only a tort—and not an offense as in the case of public nuisance—and the remedy rests exclusively with the person whose rights have been disturbed. *Fuchs v. Curran Carbonizing & Engineering Co., Inc.*, 279 S.W.2d 211 (Mo.App.1955); Restatement (Second) of Torts § 821B, comment h, § 821D (1977); Prosser, *Private Action for Public Nuisance*, 52 Va.L.Rev. 997, 999 (1966). In *Caso v. District Council 37*, 43 A.D.2d 159, 350 N.Y.S.2d 173 (1973) certain Long Island municipalities sued the New York City

sewage workers on allegations that the illegal strike caused water pollution and resulted in the contamination of the beaches of the municipalities. The court allowed recovery, but on the theory of *private nuisance*—that is, for damage done to the municipal lands. In the case we review, of course, there is no contention that the firefighters strike invaded any governmental interest in the use or enjoyment of *land*—essential to recovery for a private nuisance. Rather, the recovery pleaded and granted was for the public cost to provide the services abandoned by the public employees.

kind from that suffered by the general community, and so does not describe a recovery for a private tort.

We conclude that, although the policy of the Public Sector Labor Law intends a civil remedy for intentional tort to a public employer damaged by a strike of employees, no named category of intentional tort has affinity as a cause of action for that purpose. The power of a common law court to give remedy to redress an intentional wrong—and so [in this case] vindicate the desideratum of an enactment—does not fail because the delict falls into no traditional form of action.

There are decisions from the New York courts [*Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 451 N.E.2d 459, 464 N.Y.S.2d 712 (1983) and *Jamur Productions Corp. v. Quill*, 51 Misc.2d 501, 273 N.Y.S.2d 348 (N.Y.Sup.Ct. 1966)] which entertain with favor [although not with redress] the innominate prima facie tort theory as a remedy for injury to the public body from a strike of public employees. These decisions apply the doctrine on the analogy of its historic affinity as a remedy for employers damaged from labor union disputes in the *private sector*. The rationale of the doctrine—which allows recovery by one damaged by an intentional, and otherwise lawful act of another, done without sufficient justification [*see Porter v. Crawford & Co.*, 611 S.W.2d 265 (Mo.App.1980)]—preeminently suited the labor-management arena where union conduct to wrest work concessions intends and works economic harm to the employer. M. Forkosch, A Treatise on Labor Law §§ 191–3 (2d ed. 1965). [And, it was, indeed, in the context of private sector labor law that the prima facie tort concept, albeit not as an articulated remedy, was first applied as a principle of our jurisprudence. *Lohse Patent Door Co. v. Fuelle*, 215 Mo. 421, 114 S.W. 997 (1908); *see also Bandag of Springfield, Inc. v. Bandag, Incorporated*, 662 S.W.2d 546, 554[9] (Mo. App.1983).] The prerogative of workers to organize to better wages and work conditions in the private sector has become an objective society values and protects. To

that end, workers may act in concert even though that calculated action intends to, and does, cause harm to the employer. In terms of the prima facie tort rationale, workers in the private sector may strike, picket and boycott to the end of self-betterment, and so long as the means used remain lawful in the judicial sense—free from strife, intimidation, and the like—or not otherwise condemned by law or policy, any economic harm to the employer is merely *damnum absque injuria*, and so not actionable. That is because the strike [among other means] is merely an exercise of a legal right, so that—under the prima facie tort rationale—the damage to the employer, although intentionally inflicted, is justified. *Adams Dairy, Inc. v. Burke*, 293 S.W.2d 281, 288[4] (Mo.1956); *Lohse Patent Door Co. v. Fuelle*, 215 Mo. 421, 114 S.W. 997, 1005 (1908).

The prima facie tort as a remedy for intentional tort, however [the New York courts notwithstanding], does not readily transpose from the private sector to public sector labor disputes. That is because § 105.530, RSMo 1978 interdicts the strike as a means of self-betterment for the public employees and thereby denies them justification for the harm which results to the public employer from the interruption of a vital governmental service. That sufficiently answers the contention of the defendant Firefighters that the strike is so indispensable a tool of the worker self-betterment society values that the work stoppage, although a technical breach of the statute, remains a justified means to that end.

The civil remedy the policy of the Public Sector Labor Law contemplates as the redress for the harm inflicted by a public employee strike interruption of a vital governmental service, therefore, is that of an intentional tort, but without avail of justification to excuse culpability. It is a cause of action proven by evidence that the actor intended to produce the harm that ensued, as well as the act itself. In the case of a firefighters strike, the consequences of a disruption of that public service are so cer-

tain that the consequent harm, as well as the act, is deemed as intended. *Truck Insurance Exchange v. Pickering*, 642 S.W.2d 113, 116[1] (Mo.App.1982). That the firefighter union activity was directed at the public employer and that the dire consequences to the municipal populace from a strike were not only intended but predicted is manifest from the evidence. First, the Firefighters enlisted the agreement of their professional colleagues in the area not to enter the municipality to respond to fire or even emergency calls. Then, as prelude to strike, the Firefighters Local No. 42 released an open letter to the citizens of the city to warn that a work stoppage would commence the next day, that on their advisement, no professional firefighter in the area would enter the city to combat fire or meet emergency, suggested measures for self-help, advised parents to "[k]eep your children home from school," and ended with the imprecation: "PRAY!" There was more: Firefighters not only left the city unprotected, but left the equipment in a condition of sabotage [that it was by their agency is a reasonable surmise] and unfit to function—coils and wires pulled loose in some engines, empty fire extinguishers, depleted air tanks on life-support units, fire trucks left in an inoperable condition, and so on. And this, all in the face of injunction.

█ The evidence proves a tort recovery for damage intentionally inflicted upon the public employer by an interruption of an essential governmental function in violation of the Public Sector Labor Law, an infraction of policy the statute intends to redress by the civil action brought by the State.

## PART II

### The Class Action

The defendant Kansas City Firefighters Local No. 42 is an unincorporated association with a business office in Kansas City, Missouri, and comprised of members employed by the municipality. The original petition named as defendants thirteen [later reduced to twelve] officers and members of the executive board of Local No. 42 both as individuals and as representatives of the Union.[9] The petition alleged that the named defendants represented a class of persons who engaged in an unlawful strike. The plaintiff then moved to certify as a class under Rule *52.08* the persons who engaged in, supervised or encouraged the strike by the municipal firemen from October 3 to October 7, 1975. The court sustained the motion, determined that the suit was a proper class action under Rule *52.08,* and adopted the definition of *class* tendered by the motion:

> [T]hose individuals who, as employees within the Fire Department of The City of Kansas City, Missouri, from October 3, 1975 at 7:00 a.m. to October 7, 1975 at 7:00 a.m. were scheduled to work and were not excused from working by the City Personnel Director, but engaged in a strike or work stoppage amounting to a strike [those individuals named in stipulated Exhibit B].

The order of the court also directed that a *Legal Notice* and separate *Affidavit*, promulgated as components of the order, issue by mail at the initiative of the plaintiff to the members of the class [those persons named in Exhibit *B* ] and that such members respond within fifteen days "as to any fact necessitating the exclusion of that individual from the class ...." The order directed also that the Notice and Affidavit be published twice in the local newspaper during the fifteen-day interim. The Notice never issued to the individual members of the class [those named in Exhibit *B* ], and no reason appears in the legal file [which includes the proceedings on the initial petition and then on the amended petition after reversal of judgment by this court and remand].

---

**9.** The persons joined were Shortino [then president of Local No. 42]; Germann [then a vice-president and president at the time of suit]; Palmer, vice-president; Stevnin, vice-president; Ross, vice-president; Walsh, secretary-treasurer; and Elder, Scott, Garrison, Bradshaw, Knabe and Lynch—all then members of the Executive Board.

Judgment for $128,782.72 compensatory damages and for $25,000 punitive damages was rendered on the original petition. The adjudication was entered against the twelve named defendants and against the members of Local No. 42 employed by the municipality as firefighters listed in stipulated Exhibit *A* —the entire membership of Local No. 42, that is, all firefighters employed by Kansas City. [Thus, the judgment enlarged the class from those firefighters scheduled to work—but who failed to report—during the four-day strike period [named in Exhibit *B* ] to the full complement of firefighters employed by the city [named in Exhibit *A* ], whether or not there was an obligation for work for those days. The definition of class was enlarged, anomalously, *after* the notice was ordered, and so had the notice been accomplished as contemplated by the order, it would have been ineffectual for the purpose as to the redefined class which suffered the judgment.] The conclusions of law which preceded judgment, also, redefined the proceeding as a Rule *52.10*, rather than a Rule *52.08*, action.

This judgment, as we note, was reversed by our opinion in *State ex inf. Danforth v. Kansas Firefighters Local No. 42*, 585 S.W.2d 94 (Mo.App.1979), for failure to prove the contract theory pleaded by the petition. We determined in *Danforth* that Rule 52.10 was the appropriate procedure for an action against an unincorporated association and that the order for notice to each member of the class as defined by the trial court order was a proper exercise of judicial authority. The brief on appeal of the Firefighters presented the complaint that the order notwithstanding, the notice never issued to the defendant members, and so the judgment was not valid. We reversed on other grounds, and so did not confront that contention. On remand, the petition was amended to plead a cause of action for intentional tort. The plaintiff State of Missouri then moved the court [a successor judge] to determine that the cause be maintained as a class under the procedures of Rule 52.10. That motion went unheeded. The cause was submitted

for adjudication on the same stipulations of fact and exhibits on which the original awards rested, and the court proceeded to judgment. The successor court entered an exact duplicate of the compensatory [$128,782.72] and punitive [$25,000] damages rendered on the original petition.

On this appeal from the awards entered on the amended petition for damages for intentional tort, the Firefighters contend that the judgment for money damages against the defendant class was erroneous because the failure to give members of the class notice of the proceeding and opportunity to be heard violated the order of the trial court and, more, fundamentally, deprived them of property without due process of law.

The plaintiff State of Missouri responds that the petition on remand was an entirely separate proceeding, the new judgment entry by the successor judge represents an independent exercise of discretion as to the certification of the class—and, pretend, that the ends of Rule 52.10 would be validly subserved without notice to individual members of the class. We believe, rather, that a more cogent presumption obtains: namely, that the successor judge was faithful to the mandate of *Danforth v. Kansas City Firefighters Local No. 42*, supra, [1.c. 98] that the first trial properly invoked the procedures of Rule 52.10 for the action against the defendant unincorporated association, and that the order that notice of the proceeding issue to each member of the class was a valid exercise of judicial authority. On the retrial under our mandate, the successor judge could not have but believed—in the absence of contrary contention—that the notice directed by the certification order was accomplished as a preface to judgment. The failure of notice *as ordered* in the original trial becomes irrelevant, however, since even had the members of the class *as then* defined by the certification been given notice, the judgment was rendered against an enlarged class for whom the notice *as ordered* would have been to no avail. The legal effect of the judgment was to redefine the defendant

class—and, absent a concomitant order for notice—an abrogation of the prior directive.

The prerogative of a court to prescribe or withhold notice for members of a Rule 52.10 class is a discretion invested by the very text of the Rule. The Rule intends, however, that whatever the choice of alternative, the judicial exercise shall subserve the fair conduct of the action:

Rule 52.10 Actions Relating to Unincorporated Associations

An action brought by or against the members of an unincorporated association as a class by naming certain members as representative parties may be maintained only if it appears that the representative parties will fairly and adequately protect the interests of the association and its members. *In the conduct of the action the court may make appropriate orders corresponding with those described in Rule 52.08(d) ....* Rule 52.08 Class Actions.

. . . . .

In the conduct of actions to which this Rule applies, *the court may make appropriate orders:*

. . . . .

(2) *requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, ... or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses ....* [emphasis added]

The defendants Firefighters contend that, not only was the sense of the Rule abrogat-ed by the failure of notice to the members of the class, but that the neglect resulted in a loss of opportunity to seek exclusion and present defense—and so worked a denial of due process.

The judgment against the Firefighters Local No. 42 was the culmination of a Rule 52.10 action against members of that unincorporated association and maintained against the designated officers and board members as representatives of the class. The Rule 52.10 device allows a nonjural entity [such as a labor union], otherwise without capacity, to sue and be sued. It expresses the equitable doctrine of virtual representation, the traditional method for suit by or against a labor union. *Helton v. Hake,* 564 S.W.2d 313, 322[12] (Mo.App. 1978); *Sommer v. City of St. Louis,* 631 S.W.2d 676, 681[9–11] (Mo.App.1982); *see also White v. Quisenberry,* 14 F.R.D. 348, 349[1–3] (W.D.Mo.1953). Unincorporated Associations Class Actions Rule 52.10 and Class Actions Rule 52.08 [to which the former refers] are rescripts [10] of the federal counterparts: Federal Rules of Civil Procedure 23.2 and 23. The purpose for each rule differs. The class action [Rule 52.08 and Federal Rule 23] is an invention of practical necessity to provide " 'a procedural device so that mere numbers would not disable large groups of individuals, united in interest, from enforcing their ... rights.' " 7 Wright & Miller, Federal Practice and Procedure § 1751 (1972). Rule 52.10 [and counterpart Federal Rule 23.2] subserves a different purpose: it treats an unincorporated association as a class " 'to give "entity treatment" to the association when for formal reasons it cannot sue or be sued as a jural person....' " 7A Wright & Miller, Federal Practice and Procedure § 1861 at 457 (1972), quoting *Kerney v. Fort Griffin Fandangle Ass'n, Inc.,*

**10.** Rule 52.10 adds only: "Nothing in this Rule shall be construed to affect the rights or liabilities of labor unions to sue or be sued." That proviso merely reaffirms that Rule 52.10 expresses the principle of virtual representation— the traditional method of suit by or against a labor union. *Helton v. Hake,* 564 S.W.2d 313, 322[12] (Mo.App.1978).

The counterpart federal Rule 23.2 does not contain that provision simply because under federal law [§ 301 of the Taft-Hartley Act of 1947, 29 U.S.C. § 185] a labor union may be sued as a legal entity.

624 F.2d 717, 719[1] (5th Cir.1980). *Advisory Committee's Note*, 39 F.R.D. 69, 108 (1966). These disparate purposes are reflected in the preconditions which attend invocation of each rule: To maintain a Rule 52.08 class action requires, among other conditions, a class so numerous as to render joinder of all members impracticable, questions of law or fact common to the class, etc. To maintain a Rule 52.10 class action requires only that the representative parties will fairly and adequately protect the interest of the association and its members, and provides also that in the conduct of the action, the court make appropriate orders "corresponding with those described in Rule 52.08(d)"—among others, for notice to members of the class when fairness requires. Thus, except as component (d) of the class action rule is incorporated by reference into the operation of Rule 52.10, the two class action procedures—Rule 52.-10 and Rule 52.08 [and federal counterparts Rule 23.2 and Rule 23] are disparate and the adjudications of their legal effect bear only by analogy. *See* 7A Wright & Miller, Federal Practice and Procedure § 1861, at 458 (1972); 3B J. Moore & J. Kennedy, Moore's Federal Practice ¶ 23.2.-02 (2d ed. 1982); C. Wheaton, 15 Missouri Practice Civil Rules Practice § 52.10–1 (1976); Missouri Civil Procedure, Rule 52.-10 (The Missouri Bar 1983); *State ex inf. Danforth v. Kansas City Firefighters Local No. 42*, 585 S.W.2d 94, 97–98[5] (Mo. App.1979).

The text of Rule 52.10 [and federal counterpart 23.2], therefore, imposes no direction that notice issue to members of the class to bind them to judgment. There is requirement only that the representative parties fairly and adequately protect the interests of the association and its members, and enjoins also that the court may make appropriate orders like those described in Rule 52.08(d)—among them, to give notice to members of the class where the fair conduct of the action requires. The defendants contend, the tenor of the rules notwithstanding, the tenet of *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), that a litigant have notice and opportunity to be heard to bind the party to judgment is a requirement of constitutional due process not evaded by the mere expedient of a class action.

*Mullane* formulates due process in terms of notice and opportunity to be heard [1.c. 314[8], 70 S.Ct. at 657:

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

The United States Supreme Court had earlier, however, in *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), adapted the notice principle [later repromulgated in *Mullane* as an element of procedural due process] to the class action, 1.c. 40[3, 4], 61 S.Ct. at 117:

It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process....

·　　·　　·　　·　　·

[1.c. 41[5]], 61 S.Ct. at 118:
*To these general rules there is a recognized exception that, to an extent not precisely defined by judicial opinion, the judgment in a "class" or "representative" suit, to which some members of the class are parties, may bind members of the class or those represented who were not made parties to it.*
[6, 7]:

*The class suit was an invention of equity to enable it to proceed to a decree in suits where the number of those interested in the subject of the litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable.*

·　　·　　·　　·　　·

[l.c. 42[8], 61 S.Ct. at 118:

*[T]his Court is justified in saying that there has been a failure of due process only in those cases where it cannot be said that the procedure adopted fairly insures the protection of the interests of absent parties who are bound by it.*

[l.c. 42–43[9], 61 S.Ct. at 118–119:

*It is familiar doctrine of the federal courts that members of a class not present as parties to the litigation may be bound by the judgment where they are in fact adequately represented by parties who are present, or where they actually participate in the conduct of the litigation in which members of the class are present as parties ... or where the interest of the members of the class, some of whom are present as parties, is joint, or where for any other reason the relationship between the parties present and those who are absent is such as legally to entitle the former to stand in judgment for the latter.* [emphases added]

*Hansberry* formulates due process in terms of fair and adequate protection of the absent members of the class by those designated as representatives of that class.

The relative role of notice as an element of due process in the *Mullane* and *Hansberry* class action contexts is drawn by one preeminent commentator in the terms formulated by another: Homburger, *State Class Actions and the Federal Rule,* 71 Colum.L.Rev. 609, 645–6 (1971), quoted in 2 H. Newberg, Class Actions § 2300a, at 35 (1977):

[*Mullane*] was not a class action, but an adversary accounting proceeding in which a New York bank faced its adversaries individually to render an account for assets held in a common trust fund established under a local statute. The court lacked adjudicatory authority unless it acquired jurisdiction over each trust beneficiary. The appointment of a special guardian for the trust beneficiaries did not change that constitutional requirement. Notice and a basis for exercising jurisdiction were both indispensable prerequisites to the court's adjudicatory power. The Court found the requisite affiliation for basis purposes in the presence of a trust fund in New York; however, it condemned the notice provisions of the governing New York statute on constitutional grounds and proceeded to establish guidelines for notice procedures that answered the demands of *jurisdictional* due process.

The situation in class actions is different. Notice is not needed to vest the court with adjudicatory jurisdiction over the absent members of the class ... It is the very essence of class treatment to make it unnecessary for each member to appear and be heard; for he will be bound only if he was adequately represented by the champions of the common cause. That is not to deny that notice to the class members has a due process function. Notice in a class action is one of the elements of procedural fairness which finds expression in the requirement of adequate representation. Lack of notice under some circumstances may be so grave an offense against the principle of adequate representation as to violate due process. On the other hand, the manner of notice need not necessarily satisfy jurisdictional due process standards. [emphasis in original]

■ It is evident that to apply the *Mullane* notice and opportunity to be heard principle to all class actions—as the Firefighters would have it—would be to undermine the usefulness of that device as a tool of litigative economy. [*See* Fisch, *Notice, Costs, and The Effect of Judgment in Missouri's New Common-Question Class Action,* 38 Mo.L.Rev. 173, 191 (1973)]. The class action rules accomplish a pragmatic accommodation between the ends of judicial efficiency and fairness by a rationale which treats notice as a function of adequate representation. *Advisory Committee's Note,* 39 F.R.D. 69, 106 (1966). Thus the function of notice is to ensure effectiveness of the representation. The determinant is the nature of the class: the more cohesive the class, the less occasion

for notice. *Marcera v. Chinlund,* 595 F.2d 1231, 1240 n. 13 (2d Cir.1979); *Larionoff v. United States,* 533 F.2d 1167, 1186, n. 44 (D.C.Cir.1976). In the terminology of the *Advisory Committee's Note,* 39 F.R.D. 69, 106 (1966): "In the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class will tend toward a minimum." That is because the unity of interest among the members renders it likely that the claim of the representative will be typical of the class. Cognately, "it is less likely that there will be special defenses or issues relating to individual members ... This means that there is less reason to be concerned about each member of the class having an opportunity to be present." 7A Wright & Miller, Federal Practice and Procedure § 1786, at 143 (1972); *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 255 (3rd Cir.1975).

▬▬▬ In the terms of the class action rules: in *all* suits brought under unincorporated associations Rule 52.10 [and counterpart Rule 23.2] and suits brought under subsections (b)(1) and (2) of class actions Rule 52.08 [and subsections (b)(1) and (2) of counterpart Rule 23], the matter of notice to individual members of the class is left to the discretion of the trial judge. That is because they relate to group, rather than individual, claims and interests so that the class members are already bound together by some "pre-existing intraclass jural relation" which renders it likely that the repre-

sentative members can adequately represent the interests of the absent members. Homburger, *State Class Actions and The Federal Rule,* 71 Colum.L.Rev. 609, 629 (1971); *Alexander v. Aero Lodge No. 735,* 565 F.2d 1364, 1372–1374 (6th Cir.1977). It is only in cases under Rule 52.08(b)(3) [and counterpart Rule 23(b)(3) ]—where *questions of law or fact common to members of the class predominate over any questions affecting only individual members* —that notice to the absent members of the class is mandated. [Rule 52.08(c)(2) and Rule 23(c)(2) ]. That is because the lack of unity of interests among the members renders the class amorphous, impairs the ability of the representative to protect the stake of every member, and so offers the least protection to the absentees. 7A Wright & Miller, Federal Practice and Procedure § 1793, at 203 (1972); *Advisory Committee's Note,* 39 F.R.D. 69, 102 (1966). In the common question of law or fact class, moreover, the absentee member is allowed choice to opt out, and so escape the effect of conclusive judgment. [Rule 52.08(c)(2)(C) and Rule 23(c)(2)(C) ] Thus, the choice of a member not to exclude from the class amounts to an endorsement of the representative, and hence acquiescence to judgment. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176[9, 10], 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974). That is to say again that notice subserves to ensure the due process requirement of adequate representation in a class action.[11]

**11.** A class action under voluntary unincorporated associations Rule 52.10 presupposes, as we note, subsistent jural relations among the membership, with shared interests and government, and all but in legal capacity, a virtual corporate unit. The purpose of Rule 52.10 is to overcome this incapacity and to endow the association with entity status for suit. 7A Wright & Miller, Federal Practice and Procedure § 1861 (1971). In the usual course, therefore, an officer of the association shares the interests of the membership, and hence serves as an adequate representative of that class. *Calagaz v. Calhoon,* 309 F.2d 248 (5th Cir.1962). Notice to the absent class members, therefore, is not a usual requirement to ensure adequate representation of the absent class. Therefore, it is left to the discretion of the court.

An action under Rule 52.08(b)(1) and (2) [and counterpart Rule 23(b)(1) and (2) ] relates also to a cohesive class bound together by a common interest. These actions may be maintained, if, among other requirements: prosecutions of separate actions by or against individual members of the class would create a risk of (A) inconsistent adjudications, or, (B) adjudications as to individual members of the class would, as a practical matter, dispose of the interests of the other members of the class. Since, by their nature, the classes contemplated by these sections are homogeneous without conflict between the members of the class, so that each would be bound by principles of collateral estoppel, the members and representatives share common interests. Thus, "as long as the representation is adequate and faithful, there is no unfairness in giving res judicata effect to a judg-

■ The proceeding against the Firefighters, of course, does not seek to submit to judgment a class bound together predominantly by a common question of law or fact—and so entitled to notice as of course under Rule 52.08(c)(2). The suit was adjudicated as a class action against members of an unincorporated association under Rule 52.10, so that the provisions of Rule 52.08 [other than paragraph (d) assimilated by reference into Rule 52.10] appertain, if at all, by analogy rather than by precept. A proceeding under Rule 52.10 provides for notice to the absent members at the discretion of the judge—to protect the absentees and to ensure the fairness of the action. The contentions by the Firefighters that, the rules notwithstanding, notice was owed the absent members as a matter of *a priori* right irrespective of the nature of the class, the cohesion of the common interests, and the jural relations already subsistent among them—so as to suggest the presumptive adequacy of representation—does not comport with principles of substantive law.[12]

ment against all members of the class even if they have not received notice." *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 256 (3rd Cir.1975); 3B J. Moore & J. Kennedy, Moore's Federal Practice ¶ 23.72 (2d ed. 1982). Therefore, notice to the absent members is left to the discretion of the court.

In an action under Rule 52.08(b)(3) [and counterpart Rule 23(b)(3)], on the other hand, the members are tied together only by the predominance of common questions of law and fact. This category accommodates itself most readily where the numerous claimants seek individual money damages from a single event or transaction. 3B J. Moore & J. Kennedy, Moore's Federal Practice ¶ 23.45[1] at 23–322 (2d ed. 1982). The interests of the individual members are usually diverse, and it is more difficult for the representative to protect the interests of every member. The procedure, thus, is a tool of convenience, and subserves the basic goal of judicial economy. *Advisory Committee's Note*, 39 F.R.D. 69, 102–3 (1966); 7A Wright & Miller, Federal Practice and Procedure § 1793 (1971). To ensure adequate representation, therefore, a (b)(3) proceeding requires notice to the absent members and, unlike any other class action, allows the individual member to opt out of the suit. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

12. The defendants argue, and it is so, that a number of cases hold that notice is required as a matter of due process in *all* representative actions. That strain of decision, however, has been rejected by a preponderant majority of courts and by the most respected commentators. [See the rejection of that principle and the alignment of decisions in 3B J. Moore & J. Kennedy, Moore's Federal Practice ¶ 23.72, n. 8 (2d ed. 1982); H. Newberg, On Class Actions § 2550a (1977); 7A Wright & Miller, Federal Practice and Procedure § 1786, at 142 (1972); Note, *Class Actions: Certification and Notice Requirements*, 69 Geo.L.J. 1009, 1028, n. 160 et seq. (1980); Wolfson, *Defendant Class Actions*, 38 Ohio St.L.J. 459 n. 90 (1977).]

The most influential proponent of that principle, *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555 (2d Cir.1968) has since altered that view. *See Ives v. W.T. Grant Co.*, 522 F.2d 749, 764[14] (2d Cir.1975). Yet another court to espouse that principle [*Schrader v. Selective Service System Local Board No. 76*, 470 F.2d 73 (7th Cir.1972)] awaits occasion for reappraisal [*Bijeol v. Benson*, 513 F.2d 965, 968 n. 3 (7th Cir.1975)].

The increased prominence of the representative action as an adjudicative device against a *defendant* class prompts concern that whatever interests may bind the class, representation is not a sufficient substitute for notice and hearing. *See, e.g.,* H. Newberg, On Class Actions §§ 1148 et seq., 2300, 2325 (1977). The reasons asserted are manifold. Among them, that the option of the plaintiff to make that choice in the first instance portends that a weak representative from the opponent class will result. Note, *Defendant Class Actions*, 91 Harv.L.Rev. 630, 639 (1978). Another suggests that individual defenses—including the defense that the absent member is not among the class cannot be raised in the absence of individual notice. Wolfson, *Defendant Class Actions*, 38 Ohio St.L.J. 459, 466 (1977).

Whatever the validity of these concerns [and they are noteworthy], these authorities concur that where the class is virtually integral, notice, even to absent defendants, is dispensable. Thus, in Note, *Defendant Class Actions*, supra, l.c. 642, the author expresses the sense of the authorities: "The structure of certain types of defendant class actions virtually guarantees adequate representation. Suits against the members of a labor union or other unincorporated association, naming the officers as representatives of the class, provide one example." *See also* 7 Wright & Miller, Federal Practice and Procedure § 1770 (1972). Even that circumstance, as our opinion decides, does not always suffice to ensure adequate representation so as to dispense with notice as a requisite of due process of law. We do not subscribe to the contention of the Firefighters, however, that the fact of a defendant class, *ipso facto*, mandates notice to the individual absent class member as a requisite of due process of law.

■ The purpose of the Rule 52.10 procedure is to give an aggregate of persons, already bound together by jural relations, but otherwise without capacity under the law to sue or be sued, jural "entity treatment as a class for that purpose. 7A Wright & Miller, Federal Practice and Procedure § 1861 (1972); *Kerney v. Fort Griffin Fandangle Ass'n, Inc.*, 624 F.2d 717, 719[1] (5th Cir.1980); *State ex rel. Missouri State High School Activities Ass'n v. Ruddy*, 643 S.W.2d 596, 598[1, 2] (Mo. banc 1983). A labor union [such as Firefighters Local No. 42] exhibits, par excellence, these attributes: an aggregate of persons, voluntarily associated together for a common purpose, held together by common interests, and submitted to a common government. The members, on principles of contract, are bound together by rules of internal organization, accede to majority rule, elect officers to represent them, and are, in turn, answerable for the breaches and delicts of their representatives on principles of tort and agency. *Morris v. Willis*, 338 S.W.2d 777, 779[3, 4] (Mo.1960); *Clarkson v. Laiblan*, 202 Mo.App. 682, 216 S.W. 1029, 1032 (1919). Thus, the cohesion of interests and the authority already delegated by the membership to the officials virtually assure—in the absence of other circumstances—that the officers named as representatives of a defendant class in a Rule 52.10 procedure will adequately protect the stakes of the absent members—so that notice becomes dispensable. 7 Wright & Miller, Federal Practice and Procedure § 1770, at 659, 660 (1972); *Calagaz v. Calhoon*, 309 F.2d 248, 259[17–19] (5th Cir. 1962); *White v. Quisenberry*, 14 F.R.D. 348 (W.D.Mo.1953). That presumption of adequate representation is qualified by a proviso [Note, *Defendant Class Actions*, 91 Harv.L.Rev. 630, 642, 643 (1978) ]:

> The structure of certain types of defendant class actions virtually guarantees adequate representation. Suits against the members of a labor union or other unincorporated association, naming the officers as representatives of the class, provide one example. The membership will have already chosen the officers to represent them on a wide variety of matters. *Moreover, questions of individual conduct will rarely be in issue, since it is the conduct of the organization that has given rise to the litigation;* the appropriateness of class treatment, then, will usually be clear. [emphasis added]

It is the contention of the defendants Firefighters that the call for strike was much less than unanimous and for that reason, if for no other, notice was necessary to those nonacquiescent members of the class to allow assertion of individual defenses, and so preserve due process. They contend, in effect, that whatever presumption of adequacy of representation obtains from the fact of union office was dispelled by evidence that the strike, endorsed by the entire leadership of the local was resisted by many members of the union, so that the interest of those named to represent the class was not typical of a significant number of the absentees. It is the contention of the plaintiff State, on the other hand, that questions of individual conduct were not in issue, but that the absent members were unqualifiedly bound by principles of agency for any injury to the public employer from the consequences of the illegal strike.

■ It is the theory of class actions that all members of the class are before the court in the person of their representatives, and so are justly bound by the judgment. The principles of due process require, however, that to be bound, the class must be adequately represented: that is, the interest of the representatives and that of the absent members must be compatible, not antagonistic. *Sosna v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975); *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3rd Cir.1975); 3B Moore's Federal Practice, supra, at ¶ 23.-07[3] (1982). The stipulated evidence was that 564 of the union membership voted to strike, and 98 voted to oppose strike. [That proof merely enumerates the votes, but does not identify the voters.] The evidence was also that the *entire* cadre of officers and executive board—those desig-

nated as representatives of the entire class—voted to strike. If so, the officers stood in a litigative position adverse to that of the nonacquiescent members of the class and presented an inducement to those named representatives to forgo the defense, and hence to lessen their exposure to the satisfaction of a judgment.

The plaintiff State contends, however, that the members—the dissenters included—were *all* bound to the strike action on principles of agency, and so there was a unity of interest between the official cadre and the membership they represented in the tort action, so that the members, although absent from the proceedings, were properly bound on precepts of class action. The plaintiff asserts the authority of *Clarkson v. Laiblan,* 202 Mo.App. 682, 216 S.W. 1029 (1919) [merely repeated as dictum in *F.C. Church Shoe Co. v. Turner,* 218 Mo.App. 516, 279 S.W. 232 (1926)], for the proposition that members of a union are liable for the acts of the officers and agents when acting for the union within the scope of authority. There is no doubt about the soundness of that maxim as a generic principle of agency law. That rule, however, does not lend itself to the extrapolation the plaintiff derives: that, as applied to the tort cause of action against the membership as a class, since the strike was "union sanctioned," the dissenters were bereft of "any individualized defense," and therefore *cannot complain of want of notice or of an adverse representation.*

■ A voluntary association is governed by principles of agency. *Stone v. Guth,* 232 Mo.App. 217, 102 S.W.2d 738, 741[2] (1937). The basic premise that members of a union, as of any other voluntary association, are liable for the acts of its agents when done within the scope of authority [*Clarkson* and the *Church* dictum, supra], subsumes certain corollaries: Liability does not devolve upon a member from the fact of association only, but from a personal act, or from the act of an agent whose agency must be proven. *Meriwether v. Atkin,* 137 Mo.App. 32, 119 S.W. 36, 38 (1909). Thus, an association member

sustains no personal liability for the acts of the officers or other members unless the member participates in, authorizes, or ratifies the acts. *Stone v. Guth,* supra, 102 S.W.2d l.c. 741[2], [3]; *Montgomery Ward & Co. v. Langer,* 168 F.2d 182, 189 (8th Cir.1948); Restatement (Second) of the Law of Agency § 19, comment a, § 20, comment d (1957). *Laiblan* [and the *Church* dictum] cited by the plaintiff is of the same tenor. In that case [not a class action nor an adjudication against the general membership], there was evidence that the union steward had authority to call a strike to give effect to union ends—a practice known to the officers and approved by them over many years—so that the threat of strike by the steward against an employer which interfered with the right of contract by that employer with a third person [and so was tortious] was a liability chargeable against the officials as principals. There was no evidence that the Firefighters strike was an action within the usual authority of the Local No. 42 officials so as to bind the general membership without other approval or ratification. The evidence, rather, was that the full membership, the officers included, knew at the time the question was presented for decision that a strike of firefighters was in violation of statute, public policy and a subsistent court injunction. The very purpose of the formal vote was to solicit authority from the membership to an action openly understood to be illegal—and therefore beyond the implicit grant of any authority to the officers for such an action. Thus, on established principles of agency, the sanction of the majority for strike cannot bind the nonacquiescent members of the union. Thus, also, the dissenters were entitled to representatives who shared an interest in the assertion of nonacquiescence as a defense to the action.

■ That the union officials, prime movers for the strike, did not share the interest of the nonacquiescent members and so could not adequately represent them, is made plain from the nature of the cause of action proven. The evidence

proves an intentional tort for redress of injury to the governmental employer by a firefighter strike in violation of the policy of the Public Sector Labor Law. That cause of action presupposes an act intended to inflict harm and done without justification, because prohibited by the statute. A combination of persons [such as a labor union] who act to inflict an intentional harm without justification is also subject to liability. *Lohse Patent Door Co. v. Fuelle*, 215 Mo. 421, 114 S.W. 997 (1908). On principles of agency, members of such an association who neither authorize, nor ratify, nor assent to such conduct do not share the wrongful conduct and therefore owe no liability for the damages it incurs. F. Mechem, A Treatise on the Law of Agency § 2015 (2d ed. 1982). Thus, nonacquiescence was a defense available to exculpate a significant subclass of union member defendants from both compensatory and exemplary damages. *See* MAI 10.03 (1981). The official cadre had no interest to assert such a defense, a litigative position adverse to its own, and so was not a fair and adequate representative of that significant segment of the defendant class. The procedures adopted did not fairly ensure the protection of the interests of those absent parties, lacked due process of law, and hence the judgment fails as to the nonacquiescent members. *Hansberry v. Lee*, 311 U.S. 32, 41, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940). To vouchsafe them adequate representation, and hence due process of law, the nonacquiescent members were entitled to the protections of Rule 52.08(d)(2) —assimilated by reference into Rule 52.10 —"that notice be given [for] the opportunity of members to signify whether they consider the representation fair and adequate [and] to intervene and present ... defenses." The court had option also under Rule 52.08(d)(3) and (4)—by analogy to Rule 52.08(c)(4)(B)—to divide the defendant class into subclasses of strike assenters and strike dissenters, with a typical representative for each, to ensure a conduct of the action fair to all absent members. 3B J. Moore & J. Kennedy, Moore's Federal Practice § 23.07[2] at 23–232, § 23.07[3] at 23–241 (2d ed. 1982); 7 Wright & Miller, Federal Practice and Procedure § 1768, at 651 (1972); 7A Wright & Miller, Federal Practice and Procedure § 1790, at 189 (1972).

The judgment decrees that:

Frank P. Shortino, John Germann, Robert Palmer, John Stevnink, Robert Ross, Michael Walsh, Ray Elder, Gene Scott, Berry Garrison, Al Bradshaw, Harold Knabe, Mike Lynch and the membership of the Kansas City Firefighters Local No. 42 ... from October 3 to October 7, 1975, *listed on Exhibit A* to the stipulations entered into by the parties, pay jointly to the State of Missouri as compensatory damages the sum of $128,-782.72." [emphasis added]

The roll in Exhibit A, however, identifies *all* the members of Local No. 42 during the strike period, without tally as to the assent or dissent of each on the motion to strike. Exhibit F, which records the vote on the motion to strike, merely gives the numerical tally—564 *pro* and 98 *contra*—but without identity of the voter. We have determined, however, that the judgment fails *as to the absent nonacquiescent members* for want of due process. The evidence does not identify the individual members of the class entitled to the defense, and hence to be exculpated altogether from prima facie tort liability. We are not able to distinguish, therefore, those members whose interest coincided with that of the official cadre—and hence were adequately represented by them—from those whose interest opposed the official cadres—and hence were inadequately represented by them. This state of the proof allows no other method to give effect to our decision to protect the 98 dissenter absent members from the invalid adjudication except to set aside the judgment as to the entire union membership defendant class. The twelve individual defendants, officers and members of the executive board members of Local No. 42, against whom judgment for compensatory damages is rendered by name were properly before the court and the adjudication as to

them is res judicata. *Sears v. Norman,* 543 S.W.2d 300, 302–303[2] (Mo.App.1976); *State ex rel. St. Louis Fire Fighters Ass'n Local No. 73 v. Stemmler,* 479 S.W.2d 456, 464 (Mo. banc 1972). Accordingly, the judgment for $128,782.72 as compensatory damages is reversed as to all members of the defendant class and is affirmed as to the twelve named defendants.

### PART III

### The Award for Punitive Damages

■■■ The compensatory damages component of the judgment was rendered against the representatives of the class by name against the membership of Local No. 42 as the defendant class. The punitive damages component, however, runs against the "Kansas City Firefighters Local No. 42." In literal terms, and dissevered from the context of the full judgment recitation, this aspect of the adjudication renders judgment against a nonentity, since a voluntary unincorporated association has no legal existence as such apart from the members. *Morris v. Willis,* 338 S.W.2d 777, 779[3, 4] (Mo.1960). Thus, a voluntary association as such has no capacity for suit. The proceeding against Local No. 42, however, was undertaken as a class action under Rule 52.10. The effect of that procedure, as we note, is to endow entity status to the voluntary association which enables suit where capacity as a jural person otherwise lacked. *Kerney v. Fort Griffin Fandangle Ass'n, Inc.,* 624 F.2d 717, 719[1] (5th Cir.1980); *Advisory Committee's Note,* 39 F.R.D. 69, 108 (1966). That the proceeding failed as a class action for reasons of inadequate representation does not affect the intention of the judgment terminology. The award of $25,000 as punitive damages, therefore, must be read together with the award for compensatory damage—all as one integral judgment. There is no complaint that the compensatory damages component terminology of the judgment is deficient to adjudicate a class action. It is evident that the punitive damages component, albeit declared in the truncated language: "Kansas City Firefighters Local No. 42" means the entire membership of that union as appears in the roll of Exhibit A. That membership includes the twelve official defendants against whom compensatory damages were awarded as individuals. Thus, the award of $25,000 as exemplary damages was intended to be assessed against all the members of the class, the officer representative included.

■■■ Our opinion determines that the compensatory damages award may not stand against the members of the class apart from the individual defendants actually before the court. A parity of reasons compels conclusion also that the punitive damages award may not stand against the members of the class apart from the individual defendants. An award of punitive damages rests only on a predicate of compensatory damages. *Wilner v. O'Donnell,* 637 S.W.2d 757, 762[6] (Mo.App.1982); *Adelstein v. Jefferson Bank and Trust Co.,* 377 S.W.2d 247, 252[4, 5] (Mo.1964).

■■■ It is evident that the $25,000 amount of the exemplary damages award was assessed to punish the some 700 members of Local No. 42. Our decision renders only the twelve individual officials—the defendants actually before the court—liable to judgment, compensatory or punitive. To allow the punitive award to remain intact without further examination, therefore, may be to compromise the judgment the trial court intended. Accordingly, we remand the cause for reassessment by the trial court of the amount of punitive damages, if any, to be imposed against the twelve individual defendants.

### PART IV

### Reimbursement to the State for Expenses of the Militia

It is the final contention of the Firefighters that the cost for the deployment of the state militia rests, by express provision of statute, upon the State treasury, and that to impress that cost upon these citizens both infracts the law and amounts to a "special tax upon a specific fraction of the population."

The state militia is constituted by Article 3, § 46 of the Missouri Constitution. The Governor may deploy the militia upon a proclamation of emergency [§ 44.100, RSMo 1978], and includes the exigency of a "disaster beyond local capabilities" [§ 44.-022.1, RSMo 1978]. The cost for that activation "shall be paid out of the general revenues from the state treasury" [§ 44.-120, RSMo 1978]. There is no contention that the Governor acted without authority or that the expenses of the deployment of the militia was not paid from state funds. The contention is only that the State may not undertake to recoup that expenditure as any other party injured by a tort.

The right of a state, either as the sovereign or as a political corporation, to sue in any of its courts exists independent of statute. 81A C.J.S. *States* § 297 (1977); 72 Am.Jur.2d *States* § 90 (1974); *People ex rel. Zimmerman v. Herder,* 122 Colo. 456, 223 P.2d 197, 201[4] (banc 1950); *State Highway Department v. Florence,* 73 Ga.App. 852, 38 S.E.2d 628, 629[1–6] (1946). To enforce a right or redress a wrong as a political corporation, the state may have avail of any remedy open to a private suitor—as for instance a tort action for damage to its property. *State v. F.W. Fitch Co.,* 236 Iowa 208, 17 N.W.2d 380, 383[8–10] (1945); 81A C.J.S. *States* § 308 (1977).

These principles, universally recognized [see the citations of the several state and federal authorities under 81A C.J.S. *States* §§ 297, 308 (1977), and 72 Am.Jur.2d *States* § 90 (1974)], are followed as of course by our courts. Thus, in *Ravenscroft v. State,* 1 Mo. 536 (1825), the sovereign sued to foreclose a mortgage to recoup a loan of money. Thus, also, in *State ex rel. State Highway Commission v. Beaty,* 505 S.W.2d 147 (Mo.App.1974), the plaintiff, an instrumentality of the sovereign, sued to recover in tort from a private individual for damage done to state property [a bridge]. That bridge was constructed with funds from the general revenue in the first instance—although not a litigated issue—could not have defeated the claim [as the argument of the Firefighters would have it], for to impose such a condition would effectively nullify the right of the sovereign for redress for injury to its property. The plaintiff sues the Firefighters, not as taxpayer citizens, but as tort-feasors. The judgment imposes, not a vindictive mulct, but lawful compensation for a wrong done.

The judgment for compensatory damages is affirmed as to the twelve individual defendants. The judgment for punitive damages is reversed and remanded as to the twelve individual defendants.

The judgment for compensatory damages and for exemplary damages is reversed as to all the absent members of the defendant class.

The costs of the action are assessed against the twelve individual defendants.

All concur.